John PETRUCELLI, Petitioner,

v.

Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent.

No. CIV–80–1056C.

United States District Court,
W. D. New York.

Aug. 3, 1982.

Philip B. Abramowitz, Buffalo, N. Y., for petitioner.

Robert Abrams, Atty. Gen., State of N. Y. (Patrick O. McCormack, Asst. Atty. Gen., Buffalo, N. Y., of counsel), for respondent.

CURTIN, Chief Judge.

INTRODUCTION

This habeas corpus action challenges John Petrucelli's second conviction for the murder of Joseph Gernie who, along with Liberto Moresco, was killed in a barroom shootout in Bronx County, New York in 1968. Because he was a fugitive for several years, Petrucelli was not tried until 1973 for the murders of both men and the felonious possession of a weapon. The jury acquitted him of Moresco's murder, but found him guilty on two other counts: manslaughter in the first degree for Gernie's death, and the illegal possession of a weapon. He was sentenced to concurrent prison terms of eight and one-third years to twenty-five years for the manslaughter charge and up to seven years on the weapons charge.

Petrucelli appealed his conviction to the New York Supreme Court, Appellate Division, First Department. On March 31, 1974, that court reversed the conviction due to the pervasive "unethical" and "prejudicial" misconduct by the prosecutor. *People v. Petrucelli*, 44 A.D.2d 58, 353 N.Y.S.2d 194 (1st Dep't 1974). Petrucelli immediately moved to ban his second trial on grounds different from those raised here. When that motion was denied, he was retried in 1975. Once again, Petrucelli was convicted of manslaughter in the first degree for Ger-

nie's death and the felonious possession of a weapon. Again he appealed. Among other grounds raised on that appeal, Petrucelli contended the prosecutor's introduction of testimonial evidence relating to Moresco's death violated his rights because he had been acquitted of Moresco's murder at his first trial. The Appellate Division affirmed his second conviction without opinion. Leave to appeal to the New York Court of Appeals was denied on May 26, 1978.

Petrucelli then came to this court seeking collateral federal relief from his state conviction. After listening to argument, I determined he had not exhausted his state remedies on his claims. I therefore dismissed his application with leave to renew after he fulfilled his prerequisites to federal court intervention. Order, CIV–78–477C (September 28, 1978).

Petrucelli returned to the state courts for redress. There he applied for a state writ of habeas corpus, objecting to his second conviction on double jeopardy grounds. He alleged for the first time that the prosecutor's misconduct at his first trial barred his retrial for the same crimes under *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). Justice John S. Conable denied the application in a written Memorandum and Order on March 16, 1979. The New York Supreme Court, Appellate Division, Fourth Department affirmed Justice Conable's decision without opinion. On June 30, 1980 the New York Court of Appeals concurrently dismissed petitioner's appeal and denied leave to appeal.

Having by this time completed his protracted trek through the state judicial system, Petrucelli once again seeks a federal writ from this court. He advances two grounds for habeas relief. First he claims that his second trial was constitutionally barred under the Double Jeopardy Clause of the Constitution by virtue of the prosecutor's misconduct at his first trial. As a second basis for relief, he asserts that the prosecutor's use of evidence relating to Moresco's murder, of which he was acquitted at his first trial, infringed his constitutional rights ["Moresco evidence claim"].[1]

FACTUAL BACKGROUND

The facts surrounding Petrucelli's conviction can be briefly summarized. In the evening of December 22, 1968 the victims, Joseph Gernie and Liberto Moresco, entered the Glass Post Bar in Bronx County together. John Petrucelli, Anthony Zinzi, and Ernest Coralluzzo walked into the same bar approximately half an hour later. At that time the only other people in the bar were John Ferolito, the bar owner, and Geraldine Paciulli, a bartender. As soon as Petrucelli, Zinzi, and Coralluzzo came in, Ferolito sent Paciulli to the White Castle Restaurant across the street for coffee.

Within minutes, James Donlan, a car mechanic, heard gunfire and other noises as he drove past the Glass Post Bar. He also saw three men dart out of the building. Driving off, Donlan spotted two policemen who called for assistance and returned to the bar with him. Ferolito was standing outside and told them that someone had been shot. Inside the bar, Joseph Gernie lay on the floor, dead from gunshot wounds.

The two police officers proceeded to cross the street to the White Castle Restaurant parking lot. Immediately before the police appeared, Theresa Napoli, a White Castle carhop, observed a man later identified as Moresco walking in the parking lot with a gun in his hand. She then saw a blue automobile pull up to Moresco with its horn blowing persistently. As she watched, Moresco flew into the air, apparently having been hit by the car which quickly sped away. When the two policemen arrived five minutes later, Moresco was kneeling on the ground and bleeding. The police rushed him to the hospital where he died of gunshot wounds half an hour later.

1. On March 27, 1982 the Supreme Court announced, contrary to Second Circuit precedent, that a habeas corpus petition with both exhausted and unexhausted claims must be dismissed for failure to exhaust state court remedies. *Rose v. Lundy*, —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Following that decision, the parties submitted a stipulation which amended petitioner's original application to delete a sufficiency of evidence claim which had been included in the petition. *See* Stipulation entered April 9, 1982.

Petrucelli fled the scene with his girl-friend, Joan Platta. Platta later testified for the prosecution, stating that Petrucelli told her he had killed Moresco in self-defense. Petrucelli voluntarily surrendered to the authorities in November 1972.

In the meantime, Petrucelli, Coralluzzo, Zinzi and Ferolito were indicted for two counts of murder. Coralluzzo was tried and acquitted. Zinzi pled guilty to assaulting Moresco, and Ferolito pled guilty to criminal solicitation for his participation in the incident of December 22, 1968. Petrucelli was not tried for Gernie's murder until several years after the conclusion of the criminal proceedings against the others.

EXHAUSTION OF STATE REMEDIES

The threshold inquiry of every federal habeas court is whether the habeas applicant has fully exhausted all available state court remedies. 28 U.S.C. § 2254(b) & (c). Recognizing that the exhaustion requirement in this circuit is quite stringent, *see* *Klein v. Harris*, 667 F.2d 274, 282–83 (2d Cir. 1981); *Johnson v. Metz*, 609 F.2d 1052, 1053–54 (2d Cir. 1979); *Sabino v. LeFevre*, 490 F.Supp. 183, 186–87 (S.D.N.Y.), *aff'd*, 630 F.2d 919 (2d Cir. 1980), respondent argues that Petrucelli has failed to exhaust his state remedies in compliance with federal law. The state court records of Petrucelli's two trials reveal that respondent is incorrect with respect to both of petitioner's claims.

■ The exhaustion doctrine requires that the state courts must have had a full and fair opportunity to consider an applicant's federal constitutional claims before federal habeas relief on those grounds can be granted. *Klein v. Harris, supra; Johnson v. Metz, supra.* Petrucelli asked the state courts to resolve his constitutional Moresco evidence claim on direct appeal from his second conviction. He argued that the evidence concerning the circumstances of Moresco's death should not have been introduced at trial because·he had previously been acquitted of Moresco's murder. Al-

though the federal constitutional dimensions of this claim were not artfully described, petitioner asserted that the "admission of the Moresco evidence ... deprived him of a fair trial and due process of law.[2] Brief of Defendant-Appellant, Appellate Division, First Department, p. 10 (Trial II). He later argued that "it is inconsistent with the fundamental principles of due process to have admitted such evidence." *Id.* at 13. As in *Twitty v. Smith*, 614 F.2d 325, 332 (2d Cir. 1979), petitioner's mention of "due process" instantly brings into focus the fourteenth amendment's due process guarantees. *See Rivera v. Smith*, 492 F.Supp. 1017, 1018 (S.D.N.Y.1980). *But cf. Taylor v. Scully*, 535 F.Supp. 272, 274–75 (S.D.N.Y. 1982) (more than reference to "due process" is required).

Petrucelli also cited several federal cases to buttress his claim, including, notably, *United States v. Phillips*, 401 F.2d 301 (7th Cir. 1968). In the section of the *Phillips* opinion discussed at length in Petrucelli's appellate brief, pp. 19–20, the Seventh Circuit relied on *United States v. Kramer*, 289 F.2d 909, 916 (2d Cir. 1961). In that case, Judge Friendly articulated the federal constitutional foundation of a claim such as petitioner's.

■ For these reasons petitioner has satisfactorily presented his federal constitutional Moresco evidence claim to the state courts for resolution. He is entitled to have the merits considered by this court. *See Klein v. Harris, supra* at 282; *Daye v. Attorney General*, 663 F.2d 1155, 1156–57 (2d Cir. 1981) (reargument *en banc* April 13, 1982).

Petitioner's constitutional prosecutorial misconduct-based double jeopardy claim is in a different posture before the court than his Moresco evidence claim. He presented this ground for redress to the state judiciary for the first time in an application for a state writ of habeas corpus after he completed his direct appeals from his second

---

**2.** Petrucelli's defense attorney properly objected to the Moresco evidence throughout the trial. He also moved, at the conclusion of the

prosecutor's case, to strike all such testimony (Tr. Trial II, p. 999).

trial. Justice John S. Conable denied the petition, declaring:

If there had been no appeals, this Court would grant the relief sought. In view of the outcome of those appeals, however, this Court feels that it's [sic] instincts about the law are wrong. Both the Appellate Division decision and the action of the Court of Appeals were long after *U.S. v. Dinitz* was decided. This Court feels that the Appeal where Double Jeopardy was argued has established the law as it applies to this particular case. This Court is bound by the action of the Appellate Division.

Memorandum and Order, New York Supreme Court, Wyoming County, p. 3 (March 16, 1979). The Appellate Division, Fourth Department affirmed the decision without opinion. The New York Court of Appeals denied leave to appeal and simultaneously dismissed the appeal, stating perfunctorily that "no substantial constitutional question is directly involved."

The decision is, at best, ambiguous. Nevertheless it is possible to draw two plausible conclusions from the opinion. First, Justice Conable neither held that petitioner had waived his right to present his double jeopardy assertion by failing to raise it earlier, nor declined to discuss its merits for this reason. On the contrary, and this is the second point, the court apparently considered the legal substance of petitioner's claim, and ruled that although his decision did not comport with his "instincts," he was bound by a higher court's previous decision in this case.

These aspects of Justice Conable's decision are important in view of respondent's implicit contention that petitioner waived his prosecutorial misconduct/double jeopardy claim because he could have raised it on direct appeal, but did not. *See* Memorandum in Support of Respondent's Motion to Dismiss, pp. 6–7. This argument cannot withstand analysis. Even if the state habeas judge could have refused to entertain petitioner's application under N.Y.Crim. Pro.Law § 440.10(2)(c) for failure to raise his claim on direct appeal, he nonetheless chose to confront the merits, however sparingly. Under these circumstances, there is no reason I should give greater respect to the state's purported procedural requirements than did the state court itself. *Mitchell v. Smith*, 633 F.2d 1009, 1011 (2d Cir. 1980), *cert. denied*, 449 U.S. 1088, 101 S.Ct. 879, 66 L.Ed.2d 814 (1981). *See discussion, Klein v. Harris, supra* at 284–87.

In any event, New York law permits a petitioner to raise a double jeopardy claim by way of a state habeas corpus application despite the failure to assert the claim at trial or on direct appeal. *People v. Mitchell*, 48 N.Y.2d 1, 6–7, 420 N.Y.S.2d 371, 373–74, 394 N.E.2d 1134 (1979); *People ex rel. Pendleton v. Smith*, 54 App.Div.2d 195, 388 N.Y.S.2d 426, 429 (4th Dep't 1976). Interestingly, both Petrucelli and the petitioner in *Pendleton* were in the same procedural stance when they made their state habeas motions. As in *Pendleton, supra*, 388 N.Y.S.2d at 430–31, Petrucelli's double jeopardy right did not clearly exist until after his conviction at his second trial. Although foreshadowed by the Supreme Court's plurality opinion in *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971), the double jeopardy principles Petrucelli asserts were not expressly adopted until the Court handed down *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 on March 8, 1976. Also as in *Pendleton, supra* at 431, then-prevailing New York law permitted Petrucelli's reprosecution despite his successful appeal. *People v. Jackson*, 20 N.Y.2d 440, 446, 285 N.Y.S.2d 8, *cert. denied*, 391 U.S. 928, 88 S.Ct. 1819, 20 L.Ed.2d 669 (1967); N.Y. Crim.Pro.Law § 40.30(3).

The *Pendleton* court concluded it was entirely correct for petitioner to present his double jeopardy claim in a state habeas proceeding regardless of his failure to raise it earlier. The court reasoned that to hold otherwise would "place an impossible burden on the accused [to anticipate a drastic change in the law, and] would continually result in impractical contentions or impermissible waivers of significant constitutional rights." *People ex rel. Pendleton v. Smith, supra* at 431.

■ The identical intolerable predicament would have resulted had Petrucelli not been able to present his double jeopardy claim in his state habeas action. There is no reason to presume that Justice Conable failed to take applicable New York waiver law into account when he rejected petitioner's application. Thus, petitioner's double jeopardy claim was not waived, and is properly before this court for resolution.[3]

## PROSECUTORIAL MISCONDUCT-BASED DOUBLE JEOPARDY CLAIM

In *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), the seminal case relied on by Petrucelli, the Supreme Court affirmed that a mistrial granted at a criminal defendant's behest because of prosecutorial or judicial error will normally not foreclose a second trial. *Id.* at 607–09, 96 S.Ct. at 1079–80. The Court nevertheless pronounced that where a defendant's motion for mistrial was intentionally provoked by the "bad faith conduct" of the judge or prosecutor, a retrial is proscribed by the Double Jeopardy Clause of the fifth amendment. *Id.* at 611; *Mitchell v. Smith, supra* at 1011. This doctrine was recently refined in *Oregon v. Kennedy*, —— U.S. ——, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), handed down after the instant action was submitted for decision. The Supreme Court explained that the double jeopardy bar can be interposed by a criminal defendant who has successfully moved for a mistrial only where "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Id.* at ——, 102 S.Ct. at 2091.

■ Petrucelli, of course, is on a somewhat different footing before this court than the criminal defendants in *Dinitz* and its progeny, including *Oregon v. Kennedy*. In that line of cases, mistrials were granted by the trial court. Here, Petrucelli's fre-

quent motions for a mistrial based on the prosecutor's deplorable behavior were all denied. For purposes of double jeopardy analysis, however, I am convinced that reversal of a conviction for deliberately offensive prosecutorial misconduct warrants the same relief as a mistrial granted on that ground.

There is no reason why a criminal defendant whose timely request for a mistrial is granted should be placed in a better position than a defendant whose request is wrongfully denied. *See Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978). Indeed, it might be argued that a defendant who has been forced to endure a full trial over legitimate protests of improper prosecutorial behavior should be more vigorously protected from the "embarrassment, expense, and ordeal" of a retrial than a defendant whose mistrial motion at the first instance of prosecutorial misconduct is granted. *See Oregon v. Kennedy, supra* at —— n.6, 102 S.Ct. at 2093 n.6 (J. Stevens, concurring); *United States v. Dinitz, supra* at 606, 96 S.Ct. at 1079. Unlike the defendant whose trial has run its course over protest, the defendant whose mistrial motion was granted has not been subjected to the damaging cumulative impact of prosecutorial misconduct throughout an entire trial.

In *Burks v. United States, supra*, the criminal defendant's pre-verdict motion to dismiss based on insufficient evidence was denied. The circuit court reversed the jury's subsequent guilty verdict for lack of sufficient evidence, but gave the government an opportunity to reprosecute. On appeal, the Supreme Court ruled that the Double Jeopardy Clause forbids a second trial where a first conviction is reversed by virtue of the insufficiency of the evidence. In so holding, the court overruled its prior decisions which implied that the double

3. As previously noted, the New York Court of Appeals dismissed petitioner's appeal from the denial of his habeas corpus application for want of a substantial constitution question. Dismissal on such ground by the Court of Appeals has been construed as a "dismissal of the

constitutional issues on the merits." *Ellentuck v. Klein*, 570 F.2d 414, 422–23 (2d Cir. 1978). Accordingly, that court's dismissal here can be interpreted as a resolution of the merits of petitioner's claim, as opposed to a dismissal on procedural grounds.

jeopardy bar never attaches where the defendant seeks a new trial by way of, *inter alia,* appellate review. *Id.* 437 U.S. at 17–18, 98 S.Ct. at 2150. The Court focused instead on the nature of the reason the first conviction was nullified, and distinguished a dismissal or reversal for lack of sufficient evidence from a reversal for mere trial error where a retrial would be permitted. *Id.* at 14–16, 98 S.Ct. at 2148–2149.

In this case, had any one of Petrucelli's many mistrial motions been granted, the double jeopardy principles embodied in *United States v. Dinitz* and *Oregon v. Kennedy* would have been called into consideration. As in *Burks v. United States, supra,* the deliberate prosecutorial misconduct involved in *Dinitz* and *Oregon v. Kennedy* contemplates far more than mere trial error. Accordingly, the applicability of the prosecutorial misconduct-based double jeopardy doctrine should not be made to hinge on the outcome of a defendant's mistrial motions. *United States v. Roberts,* 640 F.2d 225, 227–28 and discussion at 230–31 (J. Norris, dissenting) (9th Cir.), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981); *United States v. Rios,* 637 F.2d 728, 729 (10th Cir. 1980), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981); *United States v. Opager,* 616 F.2d 231, 235–36 (5th Cir. 1980); *see Burks v. United States, supra,* 437 U.S. at 11, 98 S.Ct. at 2147; Comment, Double Jeopardy: An Illusory Remedy For Governmental Overreaching at Trial, 29 *Buffalo Law Review* 759, 773–76 (1980). *But see Alicea v. Kuhlman,* 537 F.Supp. 1156 (S.D. N.Y.1982).

The Appellate Division, First Department found that acts of outrageous prosecutorial misconduct pervaded Petrucelli's first trial. Characterizing the prosecutor's behavior as "prejudicial and sometimes unethical," the court recited example after example of blatant, reprehensible misconduct by the assistant district attorney. *People v. Petrucelli,* 44 App.Div.2d 58, 353 N.Y.S.2d 194, 196 (1st Dep't 1974). As examples only, the court adverted to the prosecutor's expression of his personal opinion of the witnesses' credibility by calling the defense witnesses a "bunch of thieves," and by remarking, during cross-examination of a principal defense witness, "I don't have to believe him. I believe Joan [the principal prosecution witness.]"; his prejudicial attempt during summation to place the burden on the defense to prove that one "Ray" was at the scene and might have been the killer; his questions "designed" to influence the jury regardless of the inadmissibility of the answers, such as one series suggesting that the prosecution's witness had been intimidated when all she testified was that she had been given a "dirty look"; and a question implying that defendant's former counsel "walked out on this defendant," because the attorney knew his client was guilty when in fact he had withdrawn by court order. *Id.* The court concluded:

> These instances are only illustrative of the prosecutor's misconduct throughout the trial . . . . This is not the sum of harmless errors equalling harmless error [citation omitted]; it is an erosion of the corrective efforts of the court by the cumulative effect of prejudicial conduct.

*Id.*

Presuming the appellate court's factual findings to be correct, 28 U.S.C. § 2254(d), and being satisfied that the state court record as a whole fairly supports the court's factual findings, 28 U.S.C. § 2254(d)(8), I find no reason to disturb the court's factual determinations. *See Sumner v. Mata,* 449 U.S. 539, 546, 101 S.Ct. 764, 768, 66 L.Ed.2d 722 (1981). The question then becomes whether the prosecutor's reproachable behavior in this case was intended to provoke a mistrial. If it was, Petrucelli's second trial should not have been held. *Oregon v. Kennedy, supra* at ——, 102 S.Ct. at 2091.

Throughout all the proceedings in this action, there has never been a factual finding of the prosecutor's motives for his conduct at Petrucelli's first trial. Whether an evidentiary hearing is required for this purpose is not an easily answered question. Faced with prosecutorial misconduct-based double jeopardy claims, some courts have held hearings to determine why the prose-

cutor acted as he did. *See, e.g., Oregon v. Kennedy, supra* at ———, 102 S.Ct. at 2086; *United States v. Rios*, 637 F.2d at 728–29; *United States v. Cox*, 633 F.2d 871, 873 (9th Cir. 1980), *cert. denied*, 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1982); *United States v. Martin*, 561 F.2d 135, 138 & n.4 (8th Cir. 1977) (hearing held, but court relied on affidavits submitted by prosecutor); *United States v. Kessler*, 530 F.2d 1246, 1252 (5th Cir. 1976). Other courts have not conducted independent hearings, choosing instead to deduce the intent of the prosecutors from the facts apparent in the record of the prior proceedings. *See, e.g., United States v. Roberts*, 640 F.2d at 228; *Mitchell v. Smith*, 633 F.2d at 1012; *United States v. Calderon*, 618 F.2d 88, 89–90 (9th Cir. 1980); *United States v. Gaultney*, 606 F.2d 540, 547 (5th Cir. 1979), *rev'd on other grounds*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Drayton v. Hayes*, 589 F.2d 117, 122 (2d Cir. 1979); *see also Potenza v. Kane*, 79 App.Div.2d 467, 437 N.Y.S.2d 189, 192 (4th Dep't 1981).

Although a separate evidentiary hearing on the criminal defendant's double jeopardy claim was conducted in *Oregon v. Kennedy*, the language of the Supreme Court's decision lends considerable support to the proposition that if the prosecutor's intent can be inferred from objective indicia manifested in the record, an evidentiary hearing is not necessary. Explaining its newly clarified standard, the Court stated:

> [A] standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal judicial system.

*Id.* at ———, 102 S.Ct. at 2989.

More significant is the opinion of Justice Powell, whose concurrence with four other Justices gave *Oregon v. Kennedy* its status as a majority opinion. Though agreeing with the "intention" standard established by the Court's decision, Justice Powell "em-phasize[d] that the court—in considering a double jeopardy motion—should rely primarily upon the objective facts and circumstances of the particular case." *Id.* at ———, 102 S.Ct. at 2092. Justice Powell pointed to such factors as the absence of a pattern of prosecutorial misconduct and the prosecutor's surprise at the defendant's motion for mistrial as the type of "objective factors and circumstances," extracted from the record, which a court should take under consideration. *Id.*

Undeniably, whether based on direct testimony concerning the issue or the record of past proceedings, a determination of a prosecutor's motivation for his or her trial behavior is often difficult to make. *Potenza v. Kane, supra*, 79 App.Div.2d 467, 437 N.Y. S.2d at 192. Absent a direct admission by the prosecutor that he or she intended to provoke a mistrial motion, the prosecutor's specific motive must be inferred. There is no such admission in the trial transcripts, nor do I expect the prosecutor would offer such an admission at an evidentiary hearing. Even so, the prosecutor's misconduct at Petrucelli's first trial was so extensive and inexcusable that an inference that the prosecutor deliberately goaded Petrucelli into moving for a mistrial is abundantly justified by the record, regardless of any other motive he may also have had. Several illustrations will serve to underscore this conclusion.

Gino Gallina, Esq., who testified for the defense, once represented Petrucelli and his family. On February 17, 1972, Joan Platta, her husband, and Frank Santilli, an investigator employed by Gallina, met with Gallina in his office. The meeting was taped, but the tape was excluded from evidence. Gallina testified that Platta told him at the meeting that she had lied to the prosecutor because he had coerced her. On Gallina's cross-examination, the following exchange took place:

IRWIN GOLDSMITH [prosecutor]: ... did you tell Joan Platta what your client John Petrucelli told you, just yes or no?

A: I don't recall. You have to direct my attention to the tape. I would like to hear the tape so I could—

Q: I know you would like to hear the tape. You ought to make a better one.

MR. KLEMPNER [defense attorney]: I didn't hear that last remark. May we have that read back?

... THE COURT: The remark is stricken, there is no side remarks.

MR. GOLDSMITH: He shouldn't make a remark either, it wasn't in answer to my question.

THE COURT: I don't want to argue with you which came first, the chicken or the egg. I just told you not to make any remarks.

(Tr. Trial I, pp. 1244–45).

Later during his cross-examination of Gallina, the prosecutor asked the following questions, over objection:

Q: Did either of these two investigators work for you in connection with the Vicki Panika case?

(Tr.Trial I, p. 1258).

Q: Well, did either of these two investigators work for you in the Squitieri case?

(Tr. Trial I, p. 1259).

Q: Sal and Frank, did they do any work for you in the case of Aniello Della Croce?

(Tr. Trial I, pp. 1259–60).

Q: Have you ever had any situation in any of your cases where witnesses who had previously made a statement, now give your investigators conflicting statements?

(Tr. Trial I, p. 1260).

The court sustained defense counsel's objection to the latter question. The prosecutor nevertheless persisted in questioning the witness about the three cases he had referred to earlier, which apparently had a certain degree of notoriety at the time of Petrucelli's trial. He then asked:

4. By order of Justice Bloustein, Gallina withdrew as counsel on April 23, 1973. Joseph Klempner, Esq. filed as trial counsel on April

Q: Did you, after the defendant [Victor Panika] was convicted, did you secure a statement from Edward Subleski that the agents of the federal bureau of narcotics had threatened him with jail unless he gave them certain information?

(Tr. Trial I, p. 1262).

According to defense counsel, this statement had absolutely no basis in truth, and an objection to the question was sustained. Regardless, it is evident from this line of cross-examination that the prosecutor was broaching into areas beyond the acceptable limits of impeachment, particularly with respect to an attorney witness.

Soon after, as he continued with Mr. Gallina, the prosecutor demanded:

Q: I am asking you, you don't remember that it was the middle of April that you walked out on this defendant?

A: Now, I never walked out on any defendant. You forced me into withdrawing.[4]

THE COURT: Now, just a moment, now look, Mr. Goldsmith, you provoked that.

The jury is instructed to disregard the statement made by Mr. Goldsmith that he walked out on the client. Disregard the response by Mr. Gallina, you forced me to or words to that effect. It has nothing to do with this case. You will ignore it completely and I call upon you to be more circumspect in your questioning, Mr. Goldsmith.

(Tr. Trial I, pp. 1266–67). Amazingly, the prosecutor pressed this subject with "As a matter of fact, didn't you tell Judge Bloustein—" until he was interrupted and chastised by the judge (Tr. Trial I, p. 1267).

The prosecutor did not restrict his prejudicial question to his cross-examination. For instance, during his direct examination of Joan Platta, the prosecutor noticed that Anthony Zinzi, one of Petrucelli's co-defendants who had pled guilty years before, was seated in the courtroom. In the presence of the jury the prosecutor asked:

30, 1973. The trial began May 14, 1973 (Tr. Trial I, pp. 9–10).

Q: Has Mr. Zinzi been looking at you?

A: I haven't been aware of anyone looking at me.

Q: How about in the hall before?

A: No. I passed him in the hall. I didn't really say hello to him, he didn't say hello to me. We just passed each other.

Q: Honey, didn't you tell me something before out in the hall?

A: Well, he didn't say hello to me.

Q: What did you tell me out in the hall, just awhile ago?

... What did you tell me out in the hall awhile ago, about Zinzi?

Over objection, Platta supplied the answer the prosecutor obviously wanted:

A: Kind of looked like he gave me a dirty look.

(Tr. Trial I, pp. 801–02).

The court immediately struck the answer, but denied Petrucelli's motion for a mistrial, instructing the jury to disregard Platta's answer (Tr. Trial I, pp. 802–03).

Unquestionably, prosecutors and defense attorneys alike are allowed some latitude in interpreting the available evidence in their opening statements and summations. At a minimum, however, the lawyers' versions of what occurred must coincide with and be circumscribed by the allowable evidence, as well as the applicable law. The prosecutor deliberately ignored this basic tenet in both his opening and closing statements. Several examples suffice, though more exist.

During the trial, the defense had attempted to establish that one "Ray" was at the bar the night of the shoot-out and might have been involved in Gernie's and Moresco's deaths (Tr. Trial I, pp. 234–38). Aware that the defendant has no burden of proof, the prosecutor told the jury on summation:

There was no Ray in that place. If there were, why don't they prove it, why didn't they give us his last name?

(Tr. Trial I, p. 1372).

Defense counsel's objection was sustained by the judge who cautioned:

THE COURT: Objection is sustained. The—It is the People's obligation to prove.[5]

(Tr. Trial I, p. 1372).

In the face of the court's direct ruling the prosecutor plainly knew he was prohibited from pressing his point. He nonetheless persisted:

They mentioned Ray, why didn't they prove his last name, Judge? They only gave a name of Ray. I want to know who is Ray.

(Tr. Trial I, p. 1372).

Similarly, the prosecutor was fully aware that Anthony Coralluzzo, another of Petrucelli's co-defendants, had previously been tried and acquitted of all charges relating to Gernie's and Moresco's deaths. Flouting this fact, the prosecutor implicated Coralluzzo on at least two occasions:

They came in, these three hoodlums, armed to the teeth, each one with a gun, came in to straighten out the matter.

(Tr. Trial I, p. 1374).

Similarly:

I say, if they carry guns they are hoodlums and they came in there intent on straightening out Libby Moresco because he was an informer for the police. That was the purpose of the meeting.

(Tr. Trial I, p. 1375).

Again:

This defendant and his friends pulled out guns and discharged them at the two men, killing Moresco and Gernie. I told you I would prove that. Did I prove that this defendant and his two friends pulled out guns?

(Tr. Trial I, p. 1355).

The prosecutor argued "facts" which were utterly without implied or expressed support in the record in other respects as well. For example, despite the absence of any evidence that Petrucelli or anyone else was taking drugs, the prosecutor maintained:

5. *But cf. United States v. Coven*, 662 F.2d 162, 171–72 (2d Cir. 1981) (mere prosecutorial comment on defendant's failure to refute the government's evidence or support his or her own claims is not constitutionally invalid).

I may be wrong but I have an idea that Donlan further said he didn't know what to make of it, either the man was shot or he was under the influence of drugs.

(Tr. Trial I, p. 1387).

In the face of a defense objection, the court reprimanded the prosecutor with the obvious, "Argue from the evidence only . . . ." *Id.* Yet shortly later, the prosecutor repeated this indefensible tactic. Commenting on the testimony of Anthony Mass, Esq., a defense witness he stated:

Mr. Mass, I don't know what he said, he said nothing. All I know about Mass is that he had a tape that he should have kept, whether it had anything on it or not. He walks around with a tape on him, you can't open your mouth without being on tape, apparently, with this man, walks around with this little box in his bosom or a shirt some place and he is always putting the switch on or off, you don't know whether he is getting the answer to one question or another question.

(Tr. Trial I, p. 1406).

Once again, the Court was compelled to warn the prosecutor and the jury that the prosecutor's statement was "not sustained by the evidence at all." *Id.*

In a different vein, while commenting on Joan Platta's testimony, the prosecutor made these incredible remarks to the jury:

[S]he told you that about a month later she went to Washington and picked up that car and, who did she go with? Mikey Chan's brother, Charlie Chan. That's who she went to Washington with. Can you believe this bunch of thieves—

(Tr. Trial I, p. 1411).

The following colloquy ensued:

MR. KLEMPNER: If your Honor please, I have two objections. I never heard the name Charlie Chan. There is reference to a Thomas Chianese.

THE COURT: Objection sustained. Any reference to Charlie Chan is stricken.

. . . MR. KLEMPNER: My second objection is to this bunch of thieves. I don't think there is anything in the record to indicate that Michael Chianese, Thomas Chianese or Charlie Chan is a thief.

THE COURT: Objection sustained. The jury is to disregard the statement they are a bunch of thieves.

(Tr. Trial I, pp. 1411-12).

Attempting to excuse his reference to "Charlie Chan," the prosecutor read from the trial transcript:

"Who did you fly to Washington with? "A friend of mine." Question, "Name please." Answer, "Thomas Chianese."

The prosecutor audaciously explained to the judge, "I say that's Charlie Chan." (Tr. Trial I, p. 1413).

There is no doubt the court was keenly aware of the prosecutor's egregious behavior, and vainly tried to stop it on several occasions. (*See, e.g.*, Tr. Trial I, 584–86, 745, 1140–41). Towards the conclusion of the prosecutor's summation, the exasperated trial judge had the following words with the prosecutor:

MR. KLEMPNER: Judge, I object to any of this.

THE COURT: Mr. Goldsmith, I don't speak for the sake of hearing myself talk.

MR. GOLDSMITH: You remember there was an attempt to say that he lived at 301 Bronxwood Avenue at that time—

MR. KLEMPNER: Judge, there was no such attempt. We stipulated that he lived at the former address and that after he surrendered, he came in voluntary, he went to live with his mother.

THE COURT: That was the correct statement.

MR. GOLDSMITH: That was done later, not at the beginning.

THE COURT: Mr. Goldsmith, if you want to take me on you're going to lose it.

MR. GOLDSMITH: I think I have a right to say what I think and let the jury determine it. Because in the last analysis they are going to determine the facts but I was under the other impression.

(Tr. Trial I, pp. 1400–01).

The sum total of the prosecutor's unwarranted conduct, not to mention many of the

individual instances of his trial behavior, cannot be characterized as merely spontaneous outbursts of overzealous advocacy. Nor can the prosecutor credibly contend that he did not realize the extent of his prejudicial and deplorable actions. Despite the innumerable sustained objections to the prosecutor's outbursts (*e.g.*, Tr. Trial I. pp. 802–03, 1105–08, 1245, 1260, 1261, 1411–12), and the many admonitions by the trial judge (*e.g.*, Tr. Trial I, pp. 584–86, 745, 1140–41, 1266–67, 1372, 1387, 1400–01, 1406), the prosecutor persisted in an intolerable manner in his blatant and patent attempts to prejudice the jury beyond any sphere of propriety. *Cf. Oregon v. Kennedy, supra* at ——, 102 S.Ct. at 2989. The prosecutor's deplorable conduct so permeated the trial that even the curative instructions by the judge (*see, e.g.*, Tr. Trial I, pp. 1106–08, 1305–06) could not have repaired the damage.

In his concurrence in *Oregon v. Kennedy*, Justice Stevens wrote: "Deliberate misconduct generally must be inferred from the objective evidence. The more egregious the prosecutorial error, and the harsher its impact on the defendant, the more readily the inference could be drawn." *Id.* at 4550 n.29. This is the epitome of a case where an inference of the prosecutor's deliberate attempts to compel defendant to move for a mistrial can be drawn instantly. Indeed, it is not hard to imagine that once he suspected the trial judge was not about to grant any of Petrucelli's many mistrial motions, he pushed harder and harder to infect the trial irreparably.

I am convinced the trial record amply reveals that the prosecutor deliberately provoked Petrucelli into requesting a mistrial. In doing so, I am not further obligated to explain why the prosecutor acted as he did. On the other hand, it is not inappropriate to comment on this matter.

It is not seriously disputed that the evidence adduced at Petrucelli's first trial only circumstantially linked him to Gernie's death. There was no direct physical or testimonial evidence which specifically connected Petrucelli to Gernie's gunshot wounds. The only admission proffered at trial related solely to Moresco's death, not Gernie's. Under these circumstances, if he believed the trial was going badly for him and that an acquittal was likely, the prosecutor may well have concluded it would be preferable to force a mistrial than to permit the trial to reach its completion in order to secure an opportunity to remarshal the evidence more to his liking. *See Oregon v. Kennedy, id.* at ——, 102 S.Ct. at 2091; *United States v. Tateo*, 377 U.S. 463, 468 n.3, 84 S.Ct. 1587, 1590, 12 L.Ed.2d 448 (1964).

That the prosecutor provoked the mistrial for this specific purpose is only an inference. Nonetheless, it is clear that the prosecutor at the second trial took advantage of the situation to introduce evidence directly linking Petrucelli to Gernie's death which was not offered at the first trial. Though Albert Rossi did not appear at the first trial in 1973, he was a witness at the second trial on behalf of the government. He testified that he met Petrucelli for the first time at a meeting in November or December 1972, months before Petrucelli's initial trial (Tr. Trial II, p. 745). He stated that at that meeting, Petrucelli told him that he had pulled a gun and shot Gernie after exchanging a few accusatory words with him (Tr. Trial II, p. 741). In addition, Rossi testified he had been present in the courtroom during Petrucelli's first trial (Tr. Trial II, p. 760).[6]

▮ Rossi's testimony was integral to the prosecutor's case for it provided the sole evidence directly connecting Petrucelli to Gernie's murder. The "opportunity to supply evidence which [the prosecutor] failed to muster in the first proceeding" is one of the evils the double jeopardy bar was meant to avert. *Burks v. United States, supra* 437 U.S. at 11, 98 S.Ct. at 2148. *See Illinois v. Somerville*, 410 U.S. 458, 469, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425 (1973); *United States*

**6.** Neither petitioner nor respondent nor any parties in the state court proceedings explained why Rossi did not testify at the first trial.

*v. Wilson*, 534 F.2d 76, 80 (6th Cir. 1976); *see also Drayton v. Hayes, supra* at 1204 & n.5, where the circuit court noted, with tacit approval, that the trial court directed the district attorney to stipulate that he would not call rebuttal alibi witnesses on retrial. To be sure, the prosecutor's specific reasons for provoking Petrucelli's mistrial motions cannot necessarily be deduced from the substitute prosecutor's actions at the later trial. Nevertheless, the adverse impact of the prosecutor's misconduct on Petrucelli's basic right at his first trial is more striking in the wake of the particularly damaging evidence introduced for the first time at his second trial.

█ I am mindful that courts have been reluctant to apply the double jeopardy bar based on egregious prosecutorial misconduct in other than exceptional cases. *Mitchell v. Smith, supra* at 1012–13; Comment, Double Jeopardy: An Illusory Remedy for Governmental Overreaching at Trial, *supra* at 770. However, the prosecutorial misconduct in this case is substantially more than that in *United States v. Martin*, 561 F.2d 135 (8th Cir. 1977), and *United States v. Kessler*, 530 F.2d 1246 (5th Cir. 1976), two cases where the Double Jeopardy Clause precluded retrials. If the principle of *Dinitz* is to have any meaning, the prosecutor's deliberate indefensible conduct throughout Petrucelli's first trial compels its application in this case.

Still, respondent should have an opportunity to present any evidence he may have that the prosecutor did not, as a matter of fact, intend to provoke Petrucelli's mistrial motions. Accordingly, if respondent wishes to offer such evidence, he is directed to notify the court of his intent within twenty days of the entry of this order. A prompt evidentiary hearing on this issue will then be scheduled. If no hearing request is made, my finding as to the prosecutor's intent will be final.

One further issue needs to be addressed, namely, the retroactive effect of *United States v. Dinitz, supra*. The question arises in this case because, as pointed out previously, *Dinitz* was not decided until after Petrucelli was convicted a second time. Though the Supreme Court has never confronted this question directly, I believe there is ample legal precedent to apply *Dinitz* retrospectively.

Read together, *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) and *Robinson v. Neil*, 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973) shed the most light on the retroactivity issue. After reviewing the retroactive application of its earlier decisions in depth, the *Linkletter* Court concluded that only decisions interpreting procedural rules which affected "the very integrity of the fact-finding process" would be applied retroactively. *Id.* at 639. In *Robinson v. Neil, supra*, however, the Court refused to apply the *Linkletter* test to determine the retrospective impact of *Waller v. Florida*, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 453 (1970), a double jeopardy decision, holding that the test was "simply not appropriate." *Robinson v. Neil, supra*, 409 U.S. at 508, 93 S.Ct. at 878. The *Robinson* Court explained:

> The guarantee against double jeopardy is significantly different from procedural guarantees held in the *Linkletter* line of cases to have prospective effect only. While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial.

*Id.* at 509, 93 S.Ct. at 878.

To the best of my knowledge, no federal court has considered the retroactive implication of *United States v. Dinitz, supra*. On the other hand, virtually every federal court which has considered the application of newly established double jeopardy principles since *Robinson* has determined that they are to be applied retroactively. *See Ashe v. Swenson*, 397 U.S. 436, 437 n.1, 90 S.Ct. 1189, 1191, 25 L.Ed.2d 469 (1970); *Rios v. Chavez*, 620 F.2d 702, 705–06 (9th Cir. 1980); *United States v. Bodey*, 607 F.2d 265, 268 (9th Cir. 1979); *Mizell v. Attorney General of the State of New York*, 586 F.2d 942, 946–47 (2d Cir. 1978), *cert. denied*, 440

U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1979); *Bullard v. Estelle*, 502 F.Supp. 887, 890–91 (N.D.Texas 1980); *Carter v. Estelle*, 499 F.Supp. 777, 786 (S.D.Texas 1980); *accord, People ex rel. Pendleton v. Smith, supra* at 431. *But cf. Jackson v. Justices of Superior Court*, 549 F.2d 215, 217 (1st Cir.), *cert. denied*, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 370 (1977) (retroactive application of *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) must be analyzed according to traditional balancing factors).

■ The double jeopardy doctrine embraced in *United States v. Dinitz, supra*, lies well within the bounds of *Robinson v. Neil, supra*. Its retroactive impact is indistinguishable from the retroactive effect of the double jeopardy principles in the above-cited cases. The principles articulated in *United States v. Dinitz, supra*, must therefore be applied retroactively to this action. *See United States v. Johnson*, —— U.S. ——, —— & n.11, 102 S.Ct. 2579, 2587 & n.11, 73 L.Ed.2d 202 (1982).

## MORESCO EVIDENCE CLAIM

Petrucelli's remaining claim is that the evidence relating to the death of Liberto Moresco was unconstitutionally admitted at his second trial. He argues that to admit the "Moresco" evidence deprived him of due process because it gave the jury a second opportunity to find him criminally responsible for Moresco's murder, of which he had once been acquitted.

■ This collateral estoppel argument emanates from the import of the Double Jeopardy Clause. Judge Henry Friendly cogently explained the double jeopardy consequences of a collateral estoppel claim such as the one Petrucelli raises here in *United States v. Kramer*, 289 F.2d 909 (2d Cir. 1961):

> The Government is free, within the limits set by the Fifth Amendment, see *United States v. Sabella*, 2 Cir., 1959, 272 F.2d 206, 211, to charge an acquitted defendant with other crimes claimed to arise

from the same or related conduct; but it may not prove the new charge by asserting facts necessarily determined against it on the first trial, no matter how unreasonable the Government may consider that determination to be.

*Id.* at 916. *See Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1265–66 (2d Cir. 1975), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976). Significantly, collateral estoppel is not limited solely to those facts essential to a conviction, but applies to any facts necessarily determined against the government at the first trial. *United States v. Mespoulede*, 597 F.2d 329, 334 (2d Cir. 1979).

■ To determine whether the Moresco evidence should have been barred by virtue of the collateral estoppel doctrine requires a two-step analysis. Initially the court must determine what relevant facts were necessarily found at the first trial. It must then be decided how these facts bear on the second trial. *United States v. Kramer, supra* at 913.

It is, of course, often difficult to determine with absolute certainty the reasons behind a previous jury's general verdict. *United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977). On the other hand, the court is obliged to draw reasonable inferences from the trial record; it should not strain to conjure up " 'hypertechnical and unrealistic' " grounds on which the jury conceivably could have rested its outcome. *Ashe v. Swenson, supra* 397 U.S. at 444, 90 S.Ct. at 1194; *United States v. Mespoulede, supra* at 333 & n.7.

Petrucelli maintains that by acquitting him of murder and first degree manslaughter at his first trial, the jury necessarily found he lacked the requisite criminal intent to murder or cause serious harm to Moresco. Respondent counters that the acquittal is as consistent with a finding of self-defense, accident, or mistake as it is

with Petrucelli's theory about the verdict.[7] Even if respondent is correct, however, his interpretation of the jury's verdict of acquittal neither contradicts petitioner's interpretation nor diminishes the validity of Petrucelli's collateral estoppel analysis. Applying the principles of collateral estoppel to the pleadings, evidence, and charge in the earlier trial, *see Ashe v. Swenson, supra*, 397 U.S. at 444, 90 S.Ct. at 1194; *United States v. Mespoulede, supra*, at 333, I find the jury must have decided that even if Petrucelli pulled the trigger of the gun which killed Moresco, he did not possess the criminal intent to kill him.

At his first trial, Petrucelli was tried for acting in concert with others to murder Moresco and Gernie. The evidence proved that both victims died of gunshot wounds. According to the government's theory, Petrucelli and the others murdered Moresco because he was a stool pigeon, and killed Gernie because he witnessed Moresco's murder. However, this construction of the events does not squarely mesh with the jury's verdict as understood in the context of the state court's instructions.

The judge properly charged the jury it must find Petrucelli guilty of the crimes charged if he participated to any degree in the crimes committed by any of the participants. The manslaughter verdict necessarily means the jury found that Petrucelli was involved in the shoot-out and that either he or another participant fired the shots which killed Gernie. The jury's contemporaneous not guilty verdict means the jury also decided either: (1) that Petrucelli or another participant shot Moresco in self-defense, or (2) that someone other than Petrucelli or his cohorts, such as Gernie, shot Moresco. Any other hypothesis is either incompatible with the verdict or far too incredible to be considered a serious possibility.

By virtue of the judge's instructions to the jury, if *any* of the participants intended to murder or harm Moresco, Petrucelli would have been found guilty. Correspondingly, if any of the participants intended to kill only Gernie but mistakenly shot Moresco, Petrucelli would have been found guilty. Conversely, if any of the participants shot at Moresco in self-defense but mistakenly shot Gernie, Petrucelli would have been absolved of responsibility for Gernie's death. Other than Petrucelli's analysis, the only other theory consonant with the verdict is that Petrucelli or another participant intended to kill Moresco but missed and shot Gernie instead, while at the same time Moresco was shot by someone other than Petrucelli and his gang. Particularly in light of the intensity and fast pace of a shoot-out, this last version is simply too farfetched to be plausible. As such, it must be discarded as a possible basis for the jury's verdict.[8]

A tangential inference from the jury's verdict is that the jury must have determined that neither Petrucelli nor his co-actors drove the automobile which hit Moresco in the parking lot. The uncontroverted evidence demonstrated that the driver of the car drove deliberately and directly into Moresco and then sped off. It is beyond the realm of reason that the jury would have found that one of the participants drove into Moresco after the shoot-out without intending to cause him physical harm.

As decided by the jury, then, Petrucelli or a co-participant either shot Moresco in self-defense or did not shoot him at all. For purposes of Petrucelli's collateral estoppel claim, it does not matter which of these theories the jury relied on. The critical point is that under either scenario the jury found that neither Petrucelli nor his co-participants intended to murder or physically

---

**7.** Respondent also maintains that even if petitioner's claim based on the collateral estoppel doctrine as articulated in *United States v. Mespoulede, supra*, is correct, it cannot be applied "retroactively" to this case. This argument is meritless because the collateral estoppel principles discussed in *Mespoulede* did not establish new law. *Chin v. United States*, 622 F.2d 1090,

1092 (2d Cir. 1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981).

**8.** For purposes of collateral estoppel, it cannot be concluded that the jury acted out of mercy, compromised its decision, or failed to follow the jury instructions. *See United States v. Mespoulede, supra* at 333–34 n.7.

harm Moresco. It is this conclusion, Petrucelli submits, which the prosecutor unlawfully placed in issue once again at his second trial.

Whether she actually did so cannot be answered cursorily. In other cases where the collateral estoppel impact of an earlier criminal trial was considered, the particular jury finding in issue was a tangible, observable fact. In *United States v. Mespoulede, supra*, for instance, the jury determined that the defendant did not possess the cocaine on January 31, 1978. The Second Circuit held that evidence of this concrete fact should not have been admitted at the defendant's second trial. Here, however, the absence of criminal intent found by the jury is not a perceptible, empirical fact. Rather, it is more in the nature of a logical conclusion from the set of facts presented at trial. Other than a defendant's specific statement of intent, direct evidence of such an abstract notion is impossible to adduce. It can be inferred only from analyzing the direct evidence proffered at trial.

The distinction between a concrete fact and an inferred conclusion is precisely the point raised by the government to rebut the defendant's collateral estoppel argument in *United States v. Keller*, 624 F.2d 1154 (3rd Cir. 1980). In that case, the defendant had successfully defended himself at an earlier trial not by denying his participation in a drug conspiracy but by raising an entrapment defense. At his subsequent trial for his alleged participation in another drug conspiracy, defendant again asserted an entrapment defense. To undermine his defense, the government cross-examined defendant, over his objection, about his participation in the drug conspiracy of which he had already been acquitted.

 On appeal, the government contended that collateral estoppel was inapplicable because Keller did not deny he participated in the drug distributions, but only claimed he could not be prosecuted for his participation because he had been entrapped. In other words, according to the government, collateral estoppel was inapplicable because "[i]t is not the *result* of the

prior case that was material, but rather the *facts* which were undisputed." *Id.* at 1160. The Third Circuit soundly rejected the government's argument stating:

> [To] hold that the prior conduct is admissible notwithstanding the determination by the earlier fact finder that the defendant's state of knowledge and level of participation did not satisfy the requirement of the criminal law ... would eviscerate the effect of the prior acquittal.

*Id.* See *Wingate v. Wainwright*, 464 F.2d 209, 215 (5th Cir. 1972); *see also, United States v. Phillips*, 401 F.2d 301, 305 (7th Cir. 1968). The Third Circuit's conclusion applies here with equal force. A jury has once determined that Petrucelli's "state of knowledge and level of participation did not satisfy the requirement of the criminal law." For this reason, the government was constitutionally limited in its introduction of the factual evidence of the events for which Petrucelli was acquitted, even though such evidence may not have been disputed.

The government's theory at the second trial was that Gernie and Moresco were murdered in the same incident virtually simultaneously. Consequently, the prosecutor's opening statement, her summation, and the trial itself were replete with details relating to Moresco's death, virtually all of which were admitted over Petrucelli's persistent objections. In her opening statement, the prosecutor described how Moresco staggered from the Glass Post Bar into the parking lot (Tr. Trial II, p. 40), how a gun was noticed in Moresco's clothing as he was being taken to the hospital (Tr. Trial II, p. 42), that there would be extensive ballistics evidence showing that Moresco's gun was not discharged (Tr. Trial II, pp. 44–45), and that the entire incident arose as a dispute between Petrucelli and Moresco (Tr. Trial II, p. 48).

In addition, many of the government's witnesses testified extensively to the circumstances surrounding Moresco's death. Dr. Henry Segal, the police coroner, testified not only about Gernie's death but about the fact that no bullets were recovered from Moresco's body (Tr. Trial II, p.

64). Police Officer Lawrence Wagers, who, with his partner, was the first policeman on the scene, testified extensively how he found Moresco in the parking lot, how he spoke with him, how he found Moresco's gun, and how he took Moresco to the hospital (Tr. Trial II, pp. 85–91).

Police Officer Francis Sullivan testified exclusively to the circumstances of Moresco's death; he offered no evidence at all concerning Gernie's death. Sullivan related how he saw Moresco bleeding from the chest in the parking lot (Tr. Trial II, p. 208), and how he saw an inoperable automatic weapon fall from Moresco's clothing when he lifted Moresco into the police car (Tr. Trial II, pp. 211–13). Later, several police officers testified about Moresco's automatic pistol. Through their testimony, the prosecutor sought to establish that Moresco's gun was not discharged the night he was shot (Tr. Trial II, pp. 345–49, 406–08).

Theresa Napoli, a White Castle Restaurant waitress, testified that she noticed Moresco enter the White Castle parking lot with a gun in his hand (Tr. Trial II, p. 293). She then saw a blue car drive into the lot and hit Moresco who "sort of went flying up in the air." Moresco tried to pick himself up but kept falling back to the ground (Tr. Trial II, pp. 294–96). She also observed the police arrive and drive Moresco away (Tr. Trial II, pp. 295–96).

Characterized by Petrucelli as the most objectionable use of evidence relating to Moresco's death was the testimony of Joan Platta, Petrucelli's girlfriend. As she had at the earlier trial, Platta testified that Petrucelli told her he shot Moresco in self-defense (Tr. Trial II, pp. 458–59). As defendant pointed out in his direct appeal, Platta's testimony was particularly uncalled for in view of that of Albert Rossi, who testified that in November or December 1972 Petrucelli admitted to him that he had killed Gernie four years before.

Finally, the prosecutor interwove the circumstances of Moresco's death into her summation of Gernie's death. Her account left no room for an inference other than that Petrucelli deliberately killed Moresco, notwithstanding his previous acquittal. According to the prosecutor:

"... The evidence shows you three men walked into the bar with guns, two of them wound up dead ... Petrucelli said that Libby Moresko was a stool pigeon. Libby Moresko said that Petrucelli was a stool pigeon .... [A]s a result of [Petrucelli's] feelings on the matter, Joseph Gurney died as a result of a bullet either from the gun [Petrucelli] was holding or from a gun Anthony Zinze or Ernest Carlauso was holding, because the evidence shows overwhelmingly, ladies and gentlemen, that he was there; that he had a gun; that he discharged the gun, and at the end of the shooting and at the end of the firing, Joseph Gurney was dead. [All typographical errors in original transcript.]

(Tr. Trial II, pp. 1109–1110).

As illustrated by these examples, the prosecutor's remarks and the evidence introduced by her extend far beyond the mere fact that Moresco was shot in the gun battle and, if Petrucelli did shoot him, it was not intentional. Rather they imply, virtually to the exclusion of any other possibility, that Petrucelli deliberately killed Moresco and consequently, Petrucelli intended to kill Gernie as well.

The reason the prosecutor felt impelled to introduce such prejudicial evidence is readily apparent from the nature of the incident. The shoot-out which resulted in Moresco's and Gernie's deaths was instantaneous. Attempting to separate one shooting from the other in the context of a single shoot-out would have been quite difficult, if not confusing to the jury. Furthermore, the prosecutor would have been hard pressed to explain to the jury why Petrucelli meant to kill Gernie when he did not mean to kill Moresco, particularly when most of the prosecutor's evidence and her theory concerning Petrucelli's intent related to Petrucelli's quarrel with Moresco. *See* Prosecutor's Summation, Tr. Trial II, pp. 1109–10, cited *supra* at 41. *But see* testimony of Albert Rossi, who stated Petrucelli told him he killed Gernie because he was a stool

pigeon (Tr. Trial II, pp. 750–57). Indeed, the government on appeal from the first trial emphasized more than once that the jury's earlier verdict was, in its view, inconsistent. *See* Respondent's Brief, Appellate Division, First Department, pp. 3, 27 (Trial I). Nevertheless, the specter of a difficult-to-prove theory resulting from the application of a collateral estoppel bar to portions of a prosecutor's available evidence was foreseen and addressed in *United States v. Kramer, supra*, where Judge Friendly emphasized that the government is not free to prove the new charge necessarily determined against it at the first trial, "no matter how unreasonable the Government may consider that determination to be." *United States v. Kramer, id.* at 916. At a minimum, the introduction of such extensive evidence concerning Moresco's death and the government's explanation of how it happened place the already resolved question of Petrucelli's criminal intent vis-a-vis Moresco's death before the jury once again, in derogation of Petrucelli's constitutional rights. *See United States v. Mespoulede, supra* at 336; *United States v. Kramer, supra* at 915; *see also United States v. Keller, supra* at 1159–60.

Despite the defendant's repeated objections, the judge did nothing to mitigate the effect of the prosecutor's attempt to have the jury reconsider Petrucelli's criminal intent with respect to Moresco's death. On the contrary, the court's jury instructions served to compound the constitutional infirmity, in what he both did and did not charge.

The fact that either Petrucelli did not shoot Moresco or shot him in self-defense should not have been open to question. Nevertheless, the judge reopened this issue when he charged the jurors that they should consider whether Petrucelli acted in self-defense, and therefore whether he should be found not guilty, if they decided he shot Gernie (Tr. Trial II, pp. 1160–66).[9]

Ostensibly, this specific charge does not speak at all to Petrucelli's guilt vis-a-vis Moresco. However, the balance of the judge's charge plainly reveals that a potential finding of self-defense with respect to Gernie was inextricably linked to whether Petrucelli acted in self-defense with respect to Moresco.

Prefacing his lengthy explanation of the law of self-defense to the jury, the judge observed, "You will recall during the course of the trial certain statements illuited [sic] from the witness Joan Platta on the issue of self-defense" (Tr. Trial II, p. 1160). Platta's testimony referred solely to Petrucelli's admission regarding Moresco's death; she said nothing at all about Petrucelli's connection to Gernie. Even so, her statements were the only trial evidence referred to by the judge which formed the basis for the self-defense jury instruction.

In this context, then, the judge gave the jury the inescapable impression it was up to them to decide whether Petrucelli shot Moresco in self-defense, and if so, whether his self-defense with respect to Moresco carried over to his criminal guilt with respect to Gernie. The problem with doing so, however, is that the charge also provided the jurors with the option of finding that Petrucelli intentionally killed Moresco, and therefore must have intentionally killed Gernie. In other words, by tying the possibility that Petrucelli shot Moresco in self-defense to the possibility that Petrucelli or one of his co-conspirators shot Gernie in self-defense, the judge implied that the jury might alternatively find that Petrucelli deliberately shot Gernie by finding he deliberately shot Moresco. *See* Tr. Trial II, p. 1166.

The judge reinforced this possibility by refusing to inform the jury that Petrucelli had already been acquitted of Moresco's murder (Tr. Trial II, p. 568). Had he done so, whatever inferences the jury could have

---

**9.** That the detailed self-defense charge, *see* Tr. Trial II, pp. 1160–66, was given at all further complicates the matter inasmuch as Petrucelli purposely did not interpose a justification defense, and, in fact, opposed the giving of the instruction at all. *See* Tr. Trial II, p. 1179. This issue was neither raised on direct appeal nor brought before this court as a separate and distinct claim.

drawn from the judge's instructions would have been circumscribed by their knowledge that Petrucelli either did not kill Moresco or shot him in self-defense. Without such information, the jury was given free rein to deduce that Petrucelli deliberately shot Moresco and to apply that conclusion to the circumstances of Gernie's death. Given the constitutionally grounded collateral estoppel doctrine, the jury should not have been handed this option.[10]

The problem with excising all the evidence pertaining to Moresco's murder is that a complete picture of how the shoot-out occurred would have been close to impossible to develop. One possibility would have been to eliminate as much of the prejudicial evidence as possible but to permit the prosecutor to introduce the critical fact that Liberto Moresco was shot as well. An alternative procedure, noted with approval in *United States v. Phillips*, 401 F.2d 301, 306 (7th Cir. 1968), would have been to inform the jury that Petrucelli had been cleared from criminal liability for Moresco's death. In that way, the parameters of the jury's obligation to consider the Moresco evidence in only a limited fashion would have been more precisely defined.

Because I find that Petrucelli's rights under the Double Jeopardy Clause were infringed by his retrial *per se*, contingent upon the outcome of the evidentiary hearing discussed above, as well as the prosecutor's use of the Moresco evidence at the second trial, it is unnecessary to determine at this time what procedures should be followed to vitiate the detrimental impact of the Moresco evidence at a third trial.[11]

Accordingly, Petrucelli's application for a federal writ of habeas corpus is granted.

Respondent is directed to release petitioner forthwith unless he notifies the court of his intent to offer evidence of the state prosecutor's motive for his conduct in accordance with this opinion within twenty days of the entry of this order. If no such notice is received, the Clerk of the court is directed to enter judgment in petitioner's favor within twenty days of the entry of this order.

So ordered.

---

**10.** The harm ensuing from the introduction of the Moresco evidence was exacerbated because both the prosecutor and the judge led the jury to believe that Ernest Coralluzzo might have intentionally killed Joseph Gernie, notwithstanding Coralluzzo's acquittal for Gernie's death. Tr. Trial II, pp. 48–49, 51, 1109–10, 1156, 1166. The jury was never informed that Coralluzzo was found not guilty of both Gernie's and Moresco's deaths. This issue was neither raised in Petrucelli's state post-trial proceedings nor asserted in this action.

**11.** As a related issue, I am satisfied that the introduction of the Moresco evidence without revealing Petrucelli's prior acquittal was not harmless error. Such highly prejudicial evidence was a chief component of the prosecutor's case. Moreover, Albert Rossi's testimony, the only evidence linking Petrucelli to Gernie's death without simultaneously linking him to Moresco's death, did not coincide with other evidence for the prosecution, such as the ballistics evidence. *Compare* Tr. Trial II, pp. 751–52, 756–57 *with* pp. 218–19, 335–43, 382, 392.