**Stephen ROSSETTI, Petitioner,**

v.

**John J. CURRAN, Jr., Chairman, Commonwealth of Massachusetts Parole Board, Respondent.**

Civ. A. No. 90–12237–NG.

United States District Court, D. Massachusetts.

June 21, 1995.

Matthew H. Feinberg, Matthew A. Kamholtz, Segal & Feinberg, Boston, MA, for petitioner.

Stephen Rossetti, Lewisburg, PA, pro se.

Elisabeth J. Medvedow, Atty. General's Office, Crim. Bureau, Boston, MA, for respondent.

### MEMORANDUM AND DECISION

GERTNER, District Judge.

## I. INTRODUCTION

Stephen Rossetti ("Rossetti") brings this petition for habeas corpus relief, a petition which raises important questions about the reach of the collateral estoppel protection of the Double Jeopardy Clause of the United States Constitution.

In June of 1991, Rossetti was acquitted of armed robbery with a dangerous weapon while masked, and armed assault with intent to rob. (Hereinafter *Rossetti I.*)[1] A little over a year later, he was tried for the same incident, on charges of conspiracy to assault and rob with a dangerous weapon. (Hereinafter *Rossetti II* ). Although the charge was different, the second trial was virtually identical to the first. This time the Government succeeded in its efforts. Rossetti was convicted.

Petitioner claims that the government's use, in *Rossetti II*, of evidence which formed the core of the acquittal in *Rossetti I*, was prejudicial warranting habeas corpus relief. I agree, but find the error in *Rossetti II* even more fundamental than Petitioner suggests. Not only was the introduction of evidence of acquitted conduct in *Rossetti II* prejudicial, but I conclude, the prosecution itself violated Petitioner's rights under the Double Jeopardy Clause. The substantive case, *Rossetti I*, resolved in Petitioner's favor ultimate questions of fact in the conspiracy case, *Rossetti II*. Thus, the second prosecution should not have proceeded at all.

If the Double Jeopardy Clause is to have any meaning in the real world of criminal prosecutions, it must apply to cases like this in which the Government used one case as the dress rehearsal for the next. For the reasons described below, this Court **GRANTS** Rossetti's application for habeas corpus relief.

## II. *PROCEDURAL BACKGROUND*

On December 21, 1982, Rossetti was convicted of conspiracy and sentenced to 15–20 years at the Massachusetts Correctional Institution at Walpole (now Cedar Junction). Rossetti's conviction was affirmed by the Massachusetts Appeals Court. *Commonwealth v. Royce*, 20 Mass.App.Ct. 221, 479 N.E.2d 198 (1985), *further app. rev. denied*, 395 Mass. 1104, 482 N.E.2d 328 (1985).

■ Petitioner filed this petition for habeas corpus relief on September 14, 1990. On July 14, 1992, United States Magistrate Judge Alexander recommended that the petition be denied.[2] Petitioner filed timely objections to the Magistrate Judge's Findings and Recommendations pursuant to Rule 3(b) of the Rules for United States Magistrates, and a timely request for a *de novo* review. 28 U.S.C. § 636(b)(1)(C); Rules Governing § 2254 Cases, Rule 8(b)(4), 28 U.S.C. foll. § 2254.[3] The petition presently before the Court is ripe for review.[4]

---

1. *Commonwealth v. Rossetti*, Superior Court Nos. 033699, 033718 (June 12, 1981). The two charges involved offenses against one individual, Norman Gay, a Brinks messenger, and against a second individual, Kenneth Langway, the driver of the truck.

2. Findings and Recommendations On Petition For Habeas Corpus, July 14, 1992.

3. There is no question that Petitioner exhausted his state court remedies under 28 U.S.C. § 2254. Prior to the conspiracy trial, Rossetti's counsel filed a motion styled "Defendant's Motion to Foreclose the Government from Using Facts and Evidence Determined in a Prior Trial Adverse to the Government." That motion was denied. The Government filed a motion styled "Commonwealth's Motion in Limine" seeking to bar the defense from telling the jury that Rossetti had been acquitted of the earlier charges. That motion was allowed.

Petitioner appealed his conviction, raising collateral estoppel, as well as other issues. The Massachusetts Appeals Court affirmed in *Commonwealth v. Royce*, 20 Mass.App.Ct. 221, 479 N.E.2d 198 (1985), *further app. rev. denied*, 395 Mass. 1104, 482 N.E.2d 328 (1985).

On May 7, 1987, the Petitioner filed *pro se* a "Motion For Release from Unlawful Restraint pursuant to Mass.R.Crim.P. 30A, or Alternatively, a Motion for a New Trial pursuant to Mass. R.Crim.P. 30B," *Commonwealth v. Rossetti*, Suffolk Superior Court No. 033714. The Motion was denied on June 1, 1988 by Xifaras, J. On October 26, 1989, the Massachusetts Appeals Court summarily affirmed the trial court's denial. *Commonwealth v. Rossetti* 27 Mass.App.Ct. 1422, 545 N.E.2d 1203 (1989). The Supreme Judicial Court denied Petitioner's application for further appellate review. *Commonwealth v. Rossetti*, 406 Mass. 1103, 548 N.E.2d 887 (1990).

4. Petitioner filed an earlier petition for habeas corpus relief in 1990 (C.A. 90–11441–Y). In that petition, Petitioner alleged two constitutional errors, collateral estoppel and Fourteenth Amendment violations. The Court found that the Fourteenth Amendment ground had not been exhausted in state court and dismissed the petition on July 25, 1990 as a "mixed petition" pursuant to *Rose v. Lundy*, 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982). Following dismissal, Rossetti filed the instant petition for habeas corpus raising only the collateral estoppel issue.

## III. *FACTS*

On the morning of December 4, 1980, a Brinks guard, Norman Gay, was robbed at gunpoint, and another, Kenneth Langway, was threatened. Gay and Langway were in the process of delivering money to the First National Bank in Jamaica Plain, Massachusetts, between 9:00 a.m. and 10:00 a.m. Three men were alleged to have perpetrated the robbery, with another waiting in a getaway car. The robbery netted $153,500.[5]

On December 22, 1980, Rossetti was indicted for three offenses: conspiracy to assault and rob with a dangerous weapon an employee of Brink's (Gay), armed robbery with a dangerous weapon while masked (Gay), and armed assault with intent to rob (Langway). The substantive offenses were tried first (*Rossetti I*); the conspiracy charge followed (*Rossetti II*).

When one reads the transcript of *Rossetti II*, after reviewing *Rossetti I*, one is overwhelmed by a sense of *deja vu*. In *Rossetti I*, as in *Rossetti II*, Joseph Smith, an accomplice, was the Government's informant and by far, its single most important witness. There were no eyewitnesses who identified Rossetti, and with some exceptions described below, no independent evidence.

Joseph Smith described Rossetti's involvement in both the planning and the commission of the Brinks' job. He testified that Rossetti and two others met several times in his apartment to plan the robbery. In addition, they would "case" the bank on Thursdays, the day that the Brinks' truck would conduct its regular delivery. Indeed, the planning for the heist had begun as early as October of 1980 and continued into November. At the last meeting, the night before the robbery, Smith testified that Rossetti brought with him certain equipment such as dentpullers, guns, masks and jump suits. Rossetti's job was to use the dentpullers to steal cars for the getaway the following day. Smith also testified to the participants' discussion of the use of weapons and their plans for a getaway.

Smith, who was in the getaway car, testified in detail about Rossetti's participation in the robbery itself. Neither of the guards, nor any civilian eyewitness, could even go so far as to provide a detailed description of the perpetrators, much less to identify them.[6]

After the robbery, according to Smith, all of the accomplices went to Smith's apartment to divide the stolen goods. Smith stated that he "only" received $5,000 for his role, which he described as minimal, while the other three split the lions' share of the money.

The prosecution also introduced physical evidence in an effort to link Rossetti to the offense. Based on information supplied by Smith, the police obtained a warrant to search Rossetti's apartment. There, police found $8,750 in cash. There was no testimony tying the specific serial numbers of this money to the money taken from the Brinks' guard. Instead, one witness testified to the range of serial numbers on cash that had been shipped from the Federal Reserve that day to a number of banks, including the First National Bank. While some of the serial numbers of the money found in Rossetti's apartment fell within the range of numbers shipped from the Federal Reserve that morning, some did not. Moreover, also in Rossetti's apartment was a key to a storage facility in an apartment building. The storage facility contained a pistol, identified by Gay as his. Other physical evidence, including a shotgun and two dentpullers, found in Rossetti's apartment, or the locker, were linked to Rossetti through Smith's testimony.

The defense aggressively attacked Smith's credibility—his motive to lie, what he had been promised and what he had received for his testimony. The jury heard testimony that Smith took part in an armed robbery while on escape from the Deer Island House of Correction and that in return for his testimony, the Commonwealth promised parole on his unfinished sentence at Deer Island, a Massachusetts driver's license, no prosecution for his part in the robbery, no prosecution for his escape from Deer Island, $1,500 in cash, and a plane ticket to anywhere in the

---

5. In addition to Joseph Smith, the co-conspirators were Stephen Rossetti, Joseph Sousa and Kevin Whitford.

6. Two of the three men wore masks.

continental United States. In addition, although Smith claimed to have $1000 remaining in proceeds from the robbery which was buried at a specific site, the Government never sought the return of the money. Finally, the jury was treated to Smith's record, and a litany of the occasions on which he had lied to the police officers investigating the case.

The defense was alibi. Rossetti's girlfriend, Anne Marie Jones (who later became his wife) testified as to Rossetti's whereabouts at the time of the robbery, and during some of the pre-planning meetings, including the meeting the night before the robbery itself. On the day of the robbery, she testified that Rossetti was with her at her sister's home, having spent the night there, that he drove her to his mother's house, and that she and Rossetti had breakfast with Rossetti's mother, Irene. After breakfast, Rossetti dropped off Ms. Rossetti, first, and then Ms. Jones, at their respective places of work.

Irene Rossetti corroborated Jones' account in considerable detail.[7] Every Thursday, including Thursday, December 4, she explained, she was charged with taking the payroll money from her place of employment and dropping it off at the Boston Shawmut Bank on Harrison Avenue and Beach Street, an area she described as in the "Combat Zone" of Boston. Her son, concerned for her well-being, regularly accompanied her, including on the date of the robbery.

In addition, the defense explained the presence of certain physical evidence in Rossetti's apartment and in the storage locker. Smith's girlfriend, Susan Walker, testified

that, when Smith was in Deer Island after the robbery, Smith asked her to contact Rossetti and have him get some "stuff" out of Smith's apartment. She communicated this to Rossetti. When Rossetti brought clothes to her, purportedly Smith's, she asked him "where the money was." When she reported to Smith that she received clothes from Rossetti, she also reported to him that no money was in the package.

Ralph Rossetti, Stephen Rossetti's uncle, testified to Stephen Rossetti's visit to Smith's apartment. While Stephen Rossetti was putting Smith's clothes in green bags, Ralph Rossetti found a bag with money in it, namely hundred dollar bills in packs, totalling $3600. Shown some of the money which had been found in Stephen Rossetti's apartment, Ralph Rossetti indicated that it was "similar." He then reported that Stephen said "Give me the money," adding that "[Smith] owes me the money." Ralph Rossetti then turned over the bag.[8]

The *Rossetti I* jury acquitted on all counts.

The second trial followed, a year and one half later, on the indictment charging conspiracy to assault and rob with a dangerous weapon. Joseph Smith reprised his testimony about Rossetti's role in the planning and execution of the robbery. The police witnesses reiterated their testimony concerning the physical evidence found in Rossetti's apartment and storage locker. The defense again attacked Smith's credibility, offered the same witnesses on alibi and to explain the presence of some physical evidence in Rossetti's apartment and the storage locker.[9]

---

7. Smith testified that the robbery was initially scheduled for Thursday, November 27, before the group realized that that was the Thanksgiving holiday. He indicated that even after the group realized it was Thanksgiving, they went to the bank because they believed it was possible there would be a Brinks' delivery. Ms. Rossetti was emphatic that her son Stephen, along with her other children, spent the entire Thanksgiving holiday in question with her.

8. The defense also presented the testimony of John Bianchi who was a friend of Joseph Smith. Bianchi testified that on December 4, 1980, the day of the robbery, Smith came to his home carrying a big hockey bag and directed him to turn on the television. When Smith opened the

hockey bag, Bianchi reported that he saw trash bag filled with money. He testified that Smith, referring the television coverage, said: "That's me. I'm the one that took the gun away from the guy." Smith then counted the money in Bianchi's presence, announcing that it totalled $80,000. Bianchi also reported that when he visited Smith at Deer Island, Smith threatened him if he "talked."

Smith had maintained that his only role was as driver and had not been a direct participant in the robbery. Smith had further testified that he had received only $5,000 for his participation.

9. By the time of the second trial, however, one defense witness, John Bianchi, could no longer be found.

The only difference between the evidence at the first trial and evidence at the second is that Smith testified in less detail about the planning stages in the first trial than he did in the second,[10] the Commonwealth substituted one record keeper witness, added two other record keepers whose evidence did not implicate Rossetti, and deleted one purported eyewitness who testified at the first trial, but who could not identify any of the robbers.

The *Rossetti II* jury convicted.

## IV. COLLATERAL ESTOPPEL

### A. The Framework

The prohibition against prosecuting an individual twice for the same conduct is part of the bedrock protection of the Bill of Rights. Few principles are more central or deeply rooted in the traditions of this nation. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution mandates "that no person [shall] be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., Amend. V.

■ The core concern of the Double Jeopardy Clause is that the government with its considerable resources be kept from making repeated attempts to convict a person for an alleged crime. *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). No one is to go through the embarrassment, expense and, indeed, the ordeal of successive prosecutions. *Id.* And, because the state is bound to do better if it tries and tries again, successive prosecutions enhance "the possibility that even though innocent [the individual] may be found guilty." *Id.; Blackburn v. Cross,* 510 F.2d 1014, 1018–19 (5th Cir.1975) (quoting *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971)). However mistaken that first acquittal may have been, however substantial the public outcry, the risks of government abuse through successive prosecutions was considered by the Con-

stitution's framers, and continues today, to be wholly unacceptable.

■ Traditional Double Jeopardy analysis, which focusses on the elements of the offenses charged, does not expressly apply here.[11] It is well settled that Double Jeopardy does not bar the prosecution of a conspiracy charge following the acquittal of the underlying substantive offense, any more than it would bar separate punishment for conspiracy and the substantive offense. *United States v. Felix,* 503 U.S. 378, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992); *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). For Double Jeopardy purposes, conspiracy and the underlying substantive crime are not the "same offense."

■ It does not follow, however, that there are no limits on the Government's efforts convict on one charge following an acquittal on related, substantive charges. When an acquittal in an earlier action resolves an issue of ultimate fact in a second prosecution, the collateral estoppel principles of the Double Jeopardy Clause bar re-prosecution. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). This principle is a variation on the same constitutional theme, namely, that one who has been acquitted of a crime should not be forced to "run the gauntlet" a second time. *Id.* at 446, 90 S.Ct. at 1195; *Blackburn v. Cross,* 510 F.2d 1014, 1019 (5th Cir.1975).

*Ashe v. Swenson* put this concern in bold relief. In *Ashe,* six poker players were robbed by masked gunmen who fled in a stolen car. Four men, including Ashe, were charged with seven offenses—the armed robbery of each player and the car theft. Ashe was acquitted of the robbery of one of the poker players. The state then tried him again and convicted him of the robbery of a second poker player.

---

10. Not surprisingly, in the second run through, Smith made some changes in his testimony in areas which had been the subject of the most vigorous cross-examination in *Rossetti I.*

11. The traditional test for "same offense" derives from *Blackburger v. U.S.,* 284 U.S. 299, 52 S.Ct.

180, 76 L.Ed. 306 (1932) which bars a subsequent prosecution for the same alleged criminal act, unless the act can be prosecuted and punished under different statutory provisions that require proof of different elements.

Because the second prosecution was for an offense with different elements—the robbery of the second player rather than the first—it did not run afoul of traditional Double Jeopardy protection. Nonetheless, because it entailed proof of essentially the same ultimate facts, the basic concerns underlying that protection were implicated. Those concerns, the court noted, were especially significant in modern criminal prosecutions, where overlapping statutory offenses gave prosecutors the ability to spin out a series of offenses from a single alleged criminal transaction. *Ashe,* 397 U.S. at 445 n. 10, 90 S.Ct. at 1195 n. 10.[12] Accordingly, the *Ashe* court held that, regardless of whether the second prosecution met the strict requirements of *Blockburger,*[13] once "an issue of ultimate fact has ... been determined by a valid and final judgment, that issue cannot again be litigated between the parties in any future lawsuit." *Ashe v. Swenson,* 397 U.S. at 443, 90 S.Ct. at 1194. *See also Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708 (1990); *United States v. Aguilar–Aranceta,* 957 F.2d 18, 23 (1st Cir.),

*cert. denied,* —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992).

The Court reasoned that Ashe's acquittal in the first trial had to have resolved the question of whether Ashe had been one of the robbers at all—in Ashe's favor.[14] Since such proof was an ultimate fact in any robbery prosecution, Ashe could not be convicted unless the prosecution were permitted to relitigate it. The relitigation of facts essential to the second trial, which facts had been resolved in the defendant's favor by an earlier jury, the Court held to be unconstitutional.

One question left open after *Ashe,* and not conclusively resolved by the later cases, was what to do when the issues litigated in the first trial (at which the defendant was acquitted) fall short of being "ultimate facts" in the second. Some courts and commentators took the position that in such cases, a second prosecution could proceed, but all evidence pertaining to facts resolved against the Government (hereinafter "evidence of acquitted conduct") had to be excluded.[15]

**12.** The Court underscored the "potential for unfair and abusive reprosecutions presented by the plethora of overlapping statutory offenses" which did not violate the letter of the Double Jeopardy provision, but could, under certain circumstances, violate its spirit. *Ashe,* 397 U.S. at 445–46 n. 10, 90 S.Ct. at 1195 n. 10.

**13.** The *Blockburger* test was especially suited to the more simple criminal offense framework of the time, 1932. Commentators and the Court have recognized that it may not prove adequate in the context of today's complex criminal statutory framework.

"With its narrow focus on proof of an additional fact, the *Blockburger* test is well suited to addressing the harassment concerns of a criminal system with few overlapping criminal offenses. However, the fact that the test allows the defendant to be tried repeatedly for the same conduct, combined with a proliferation of overlapping offenses, suggests both that it can no longer adequately protect defendants from double jeopardy and that the Court must interpret the double jeopardy clause in the light of current circumstances." The Supreme Court, 1989 Term, 104 Harv.L.Rev. 40, 156–157 (1990). See also note 24, *infra.*

**14.** The first trial established that the poker player had been a victim of an armed robbery and that some of his personal property, as well as that of the other players, had been taken. What was not clear was whether there were four or three rob-

bers, and, even more uncertain, whether Ashe was among them. Three other defendants had been arrested together; evidence linking Ashe to the scene was weak.

**15.** *See e.g.* Poulin, "Collateral Estoppel in Criminal Cases: Reuse of Evidence After Acquittal," 58 U.Cinn.L.Rev. 1 (1989). The cases often refer to the non-*Ashe* situations as collateral estoppel with respect to an "evidentiary fact" in order to distinguish it from the situation presented in *Ashe.* In *Ashe* the prior acquittal determined facts which were a necessary element of the second offense. In the situation referred to above, the previously litigated facts are introduced only as some evidence of an element of the second offense.

One commentator describes the distinction between evidentiary facts and ultimate facts as follows: "An ultimate fact is one that is essential to the maintenance of the law suit," including the statutory elements of the crime. Evidentiary facts are " '[t]hose facts which are necessary for the determination of the ultimate facts, they are the premises upon which conclusions of ultimate facts are based.' " Randall, Comment, *Acquittals in Jeopardy: Criminal Collateral Estoppel and the Use of Acquittal Act Evidence* 141 U.Pa. L.Rev. 283, 292 n. 46 (1992) citing to *Black's Law Dictionary,* 557 (6th Ed.1990) (which in turn cited to *Womack v. Industrial Comm'n,* 168 Colo. 364, 451 P.2d 761 (1969)).

In *Dowling v. United States, supra,* the Supreme Court rejected such a per se rule of exclusion. *Dowling* involved a prosecution for bank robbery of a defendant who had been acquitted of an earlier, unrelated burglary. The trial court had allowed the victim of the earlier burglary to testify that the man who entered her house wore a ski mask, similar to the one used by the bank robber, and that she had been able to identify the intruder as Dowling after unmasking him during a struggle.

The Supreme Court "declin[ed] to extend *Ashe v. Swenson* and the collateral estoppel component of the Double Jeopardy Clause to exclude in all circumstances ... relevant and probative evidence that is otherwise admissible under the Rules of Evidence, simply because it relates to alleged criminal conduct for which the defendant has been acquitted." *Id.* at 348, 110 S.Ct. at 672. The Court concluded that when the prosecution seeks to relitigate evidentiary facts which it failed to prove in an earlier trial, their use is not absolutely barred by the Constitution. Rather, the introduction of such facts is governed by the principles of relevance and fairness embodied in Fed.R.Evid. 404(b),[16] which may or may not require their exclusion.

Turning to the facts of this case, the first question presented by the *Ashe–Dowling* framework is whether the earlier acquittal in *Rossetti I* determined facts that comprised the ultimate issue in *Rossetti II,* as in *Ashe,* or merely determined facts that were "evidentiary facts" in the later case, as in *Dowling.* The government concedes that if the robbery trial resolved the issue of Rossetti's planning *and* participation, subsequent prosecution for conspiracy would be barred under *Ashe*'s doctrine of ultimate issue estoppel. The government contends, however, that *Rossetti I* resolved only the question of Rossetti's participation in the robbery, which was

not an "ultimate issue" in *Rossetti II.* Moreover, it contends that even if the admission of such "evidentiary facts" were improper, it was harmless error.[17]

I disagree. I conclude that *Rossetti I* resolved the ultimate issue of the petitioner's planning of the robbery, and thus, that prosecution for conspiracy was barred. I also find that even if *Rossetti I* did not resolve the issue of Rossetti's participation in the conspiracy, it clearly resolved the question of his participation in the robbery itself. The introduction of that testimony in *Rossetti II* was so prejudicial, so intertwined with the testimony of Rossetti's alleged planning of the robbery, that no rational jury could disentangle them. Accordingly, its admission also amounted to reversible error under *Dowling* and is a sufficient basis for granting petitioner his sought after relief.

### B. *Ultimate Issue Collateral Estoppel*
#### 1. *Methodology*

■ Because criminal juries return only general verdicts, it is up to the reviewing court to determine what issues were decided by the first trial. The court must "examine the record of a prior proceeding, evaluating the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict" upon an issue other than that which is sought to be foreclosed from consideration. *Ashe v. Swenson,* 397 U.S. at 444, 90 S.Ct. at 1194 (citation omitted); *United States v. Dray,* 901 F.2d 1132, 1136–37 (1st Cir.) *cert. denied* 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990); *Petrucelli v. Smith,* 544 F.Supp. 627, 640 (W.D.N.Y.1982); *United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir.1979). And the Court is to do so with a practical eye, without being "hypertechnical," or applying the "archaic approach of a 19th century pleading book," taking into account "all

---

**16.** Rule 404(b) holds:

(b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

**17.** To be sure, the Government had taken this position prior to the *Dowling* decision. Likewise, the Court in *Commonwealth v. Royce,* 20 Mass.App.Ct. 221, 227, 479 N.E.2d 198 (1985), writing before *Dowling,* concluded that evidence of Rossetti's active participation in the offense should have been excluded in the subsequent conspiracy trial but that the error was harmless.

the circumstances of the proceeding," and not straining to come up with unrealistic grounds upon which the jury could have rested its outcome. *Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194. *See also, Petrucelli v. Smith*, 544 F.Supp. at 640; *United States v. Medina*, 709 F.2d 155, 158 (2d Cir.1983) (citations omitted); *United States v. Aguilar–Aranceta*, 957 F.2d 18, 23 (1st Cir.), *cert. denied* —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992).[18]

■ The defendant bears the burden of proving collateral estoppel. He must show that the issue of fact was decided in his favor; that he was required to litigate the same issue at the subsequent trial; and, that it was an ultimate issue in the second trial. *United States v. Dray*, 901 F.2d 1132, 1138 (1st Cir.1990). That burden is a substantial one, described as an "unequivocal showing" that an ultimate issue was already litigated, and not the "mere possibility." *See, U.S. v. Aguilar–Aranceta, supra* at 23–25.[19]

### 2. *What Rossetti I Resolved*

■ The determination of whether a jury decided an issue of fact in a defendant's favor is hardly an easy task. I have examined the record of *Rossetti I*, including the testimony of all the witnesses, the opening statements and the closing arguments, and the judge's instructions. Based on my review of the record, I have concluded that there is no basis upon which the jury could have acquitted Rossetti, other than by concluding that Rossetti had not participated in the criminal conduct at all, neither the robbery nor the conspiracy to commit it. *See Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1195; *United States v. Dray*, 901 F.2d at 1136–37.

By the time the jury got the case for decision, there were two and only two realistic alternatives—believing Joseph Smith's account in its entirety, or not. The jury obviously opted for the latter. A third alternative, that the jury somehow parsed out Smith's testimony that Rossetti planned the robbery, while disbelieving his testimony that

---

**18.** "Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Ashe*, 397 U.S. at 444, 90 S.Ct. at 1195 (citations omitted). Indeed, the *Ashe* court cited approvingly to the following language: "If a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possibility of a multiplicity of prosecutions is staggering. In fact, such a restrictive definition of 'determined' amounts simply to a rejection of collateral estoppel, since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction." Mayers & Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 Harv. L.Rev. 1, 38–39 (Nov.1960); *Ashe*, 397 U.S. at 444 n. 8, 90 S.Ct. at 1194 n. 8.

The language of *Ashe* is, however, at odds with its underlying rationale. On the one hand, it suggests an almost abstract analysis, whether a "rational jury" "could have" based its verdict in the first trial on an ultimate issue to be relitigated in the second. On the other hand, the court's analysis in *Ashe* and its admonition not to be hypertechnical, suggest an analysis grounded in the facts of the case.

In *Ashe*, a rational jury could have believed, in the abstract, that Ashe had not robbed one victim of the seven, but had robbed the others. That

was a conceivable basis for the not guilty in the first trial, but surely not a realistic one given the evidence. *See*, Brown, Comment, *The Double Jeopardy Clause: Refining the Constitutional Proscription Against Successive Criminal Prosecutions*, 19 UCLA L.Rev. 804, 831–32 (1972) ("In *Ashe*, because the jury could have grounded its decision on facts which would not have negated Ashe's guilt, the Supreme Court apparently took a broader view of an ultimate issue of fact than would be taken for purposes of civil collateral estoppel.")

**19.** This is a curious assignment of the burdens. Typically the burden of proving a given issue is placed on the party with the disfavored position, i.e. in a warrantless search, on the government who has to justify searches in presumptive violation of the Fourth Amendment. By that standard the presumption should be against successive prosecutions for related crimes. As Justice Brennan noted in his dissent in *Dowling*: "Because criminal verdicts are general verdicts, it is usually difficult to determine the precise route of the jury's reasoning and the basis on which the verdict rests. By putting the burden on the defendant to prove what issues were 'actually decided,' the Court essentially denies the protection of collateral estoppel to those defendants who affirmatively contest more than one issue or who put the Government to its burden of proof with respect to all elements of the offense." 493 U.S. at 357–358, 110 S.Ct. at 677 (Brennan, J. dissenting).

Rossetti participated in it, is entirely implausible.[20]

The testimony offered no such alternative. Smith testified to a series of events beginning with the pre-robbery planning meetings, through the robbery itself.[21] Rossetti's counsel vigorously attacked him. Rossetti's alibi was directed, for the most part, to the entire time period covered by Smith's testimony. His witnesses also attempted to explain the presence of the physical evidence in his apartment, and the jury apparently accepted that explanation.

In his closing in *Rossetti I*, Rossetti's counsel argued that Smith made up the story of Rossetti's role in the planning of the robbery, and the offense itself, out of whole cloth. His client was neither at the pre-planning meetings or the robbery. He was with his girlfriend and his mother on the date of the crime, as well as the night before when the bank was "cased" for the last time. He surely had not participated in the Thanksgiving day trek to the bank, which occurred when he was celebrating the holiday with his family. He wound up with the physical evidence when Smith, through Smith's girlfriend, asked Rossetti to clean out Smith's apartment, and Rossetti haplessly agreed. In contrast, the prosecutor argued that Rossetti did it all—planning and participation,

that Smith was believable, that the physical evidence in the storage locker and in Rossetti's apartment fully corroborated Smith's account.

No one argued, no witness testified, no physical evidence was provided, that remotely suggested Rossetti had only been involved in the robbery and eschewed participation in the planning. The prosecution's case, like the defense's, was a seamless web.

 The court's instructions on joint venture liability, while not in error,[22] permitted the jury to elide participation in the substantive offense, and planning for it. Those instructions included the following:

> In order, therefore, to find this defendant guilty of the crime of robbery, you must be satisfied ... beyond a reasonable doubt that he participated with others in this armed robbery *and not that he was merely present at the time but that in some active way he associated himself with the crime before it was committed* and put himself in a position or location where he might aid or assist in the commission of the crime. *You must be satisfied that this defendant combined and confederated in advance with the others to accomplish an illegal purpose.* (emphasis added).

Q. Was Stephen Rossetti involved in the planning stage as well as the actual robbery?

A. Yes sir.

Q. Did he case the bank with you as well on the Thursdays before the robbery?

A. Yes sir, we all went together ...

\* \* \* \* \* \*

Q. Was each of these occasions a Thursday leading up to this December 4?

A. Always a Thursday.

**20.** To be sure, the Massachusetts Appeals Court came to the opposite conclusion, that the "jury could have acquitted Rossetti by finding that he did not participate in the actual commission of the robbery but without necessarily rejecting evidence of his planning and preparation for the robbery...." 20 Mass.App.Ct. at 228, 479 N.E.2d 198. The Court indicated that it had been provided with a transcript of the testimony of Rossetti's first trial, but did not have the judge's instructions to the jury. *Id.* at 203 n. 4, 479 N.E.2d 198.

**21.** The topic of Rossetti's role in the planning was testified to in detail on direct, covered again on cross, and covered in even more detail on redirect. The defense, attempting to spoof Smith's account that he had a minimal role in the offense, for which he received "only" $5,000, went over Smith's elaborate role in planning the robbery, casing the bank, etc. The prosecution retaliated by reiterating on redirect, what had been brought out on direct, namely, what a central role Rossetti had in the pre-robbery planning activities. The following testimony by Smith, taken in *Rossetti I*, is an example:

**22.** Joint venture and conspiracy are different offenses with different elements. Conspiracy requires an "agree(ment) to work in concert for the criminal or corrupt or unlawful purpose." *Commonwealth v. Cook,* 10 Mass.App.Ct. 668, 674, 411 N.E.2d 1326 (1980). Joint venture, on the other hand, requires that "the defendant was present at the scene, that he assented to the crime occurring, and that he put himself in a position where he could render aid to the perpetrator if it should become necessary." *Id.* See also, *Pereira v. United States,* 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954).

Important evidence of Rossetti's "associat[ing] himself with the crime before it was committed" or "confederat[ing] in advance with others" was Smith's account of the pre-robbery planning meetings. It is inconceivable that the jury that acquitted Rossetti of a joint venture to commit the robbery could have believed that he had nevertheless participated in the planning.

Based on the evidence, the closing and the instructions, I find that *Rossetti I* resolved the question of Rossetti's participation in *both* the robbery and its planning.

No broad rule is announced here; conspiracy trials regularly follow the acquittals of substantive offenses without problem. A defendant cannot, by presenting a laundry list of alternative defenses, necessarily muddy the general verdict, and foreclose further prosecutions.[23] At the same time, a prosecutor does not risk being barred from further prosecutions simply because he happened to include more than he needed to convict in the first trial. Nor does a judge foreclose a subsequent conspiracy trial, just because he or she noted that participation in prior planning of an offense can be part of the evidence on joint venture.

What is problematic here is the combination of all these factors—a prosecutor who made conspiracy evidence part of the trial of the substantive case, presenting evidence of planning which was closely and directly linked to the participation evidence, namely, a meeting the very night before the crime; a defendant who claimed, like Ashe, that he was not present during any of the events the government alleged; joint venture instructions which permitted the jury to consider substantive liability even if they believed the defendant was not present at the offense, based solely on his pre-robbery activities; a second trial in which the prosecution did virtually nothing new.

If I am to be true to the rule of *Ashe,* to use a non-technical, practical evaluation of the issues resolved in the first trial, to be mindful of the very important policies underlying the Double Jeopardy Clause, then I must conclude that *Rossetti I* resolved both the issues of planning and participation, and that these were the ultimate issues in *Rossetti II. See, United States v. Aguilar–Aranceta, supra; Petrucelli v. Smith,* 544 F.Supp. 627, 640 (W.D.N.Y.1982); *United States v. Mespoulede,* 597 F.2d 329, 334 (2d Cir.1979). Accordingly, the trial of *Rossetti II* should have been barred.

## C. *Evidentiary Collateral Estoppel*

The Government contends that, at most, *Rossetti I* resolved the question of participation in the robbery and that this fact is insufficient to require a new trial. Since the reviewing state courts as well as the Magistrate Judge accepted this contention, I will address it as well.

*Dowling* suggests that, in non-*Ashe* situations, the only question is whether the evidence of acquitted conduct is admissible under Rule 404(b) of the Federal Rules of Evidence. Under the facts in *Dowling,* the Court concluded it was. In addition, the Court found that there was no due process problem with the introduction of such evidence, rejecting petitioner's claim that the evidence raised a "constitutionally unacceptable risk that the jury will convict the defendant on the basis of inferences drawn from the acquitted conduct." According to the Court, the defendant's due process interests were adequately protected by the judge's discretion to exclude unduly prejudicial evidence under Rule 404(b), and, although not specifically mentioned, the judge's ability to fashion limiting instructions, as the judge in *Dowling* had done.[24]

*Dowling,* however, arises from an entirely different context than does the instant case.

---

**23.** While defense counsel can rarely present alternative defenses—i.e. "I was not there but if I were there, I did not have the legal intent to do the crime"—it is not unusual for the defense to challenge more than one aspect of the prosecutor's case. Just because a defense lawyer has done so does not necessarily mean that all facts he or she has put at issue are barred from further litigation in the event of an acquittal. The analysis is entirely fact bound.

**24.** Both after the testimony, and again in the final charge, the judge emphasized the limited purpose for which evidence of the earlier burglary was being.offered. *Dowling,* 493 U.S. at 346, 110 S.Ct. at 671.

*Dowling* involved the admissibility of evidence of acquitted conduct in a subsequent, unrelated trial. By contrast, this case deals with the admissibility of such evidence in a trial that derives from the very same transaction as the acquitted conduct. While the offenses in *Dowling* occurred at different times, with different victims and to a degree, different participants, the offenses at issue here involved the same participants, the same offense, and followed a day later. Surely, the admissibility of acquitted conduct in this case necessarily raises issues of fairness and dimensions of prejudice which the Court in *Dowling* was not obliged to consider.

■ Evidence of Rossetti's participation in the substantive offense was offered for the same purpose in the conspiracy trial as it had been in the first trial, that Rossetti was central, that he was involved from the pre-robbery planning meetings, through the crime itself.[25] The inference, which the prosecutor made explicit in his closing, *see infra,* was this: Since Rossetti was at the scene of the robbery, just as Smith said, he is likely to have been at the scene of the plannings, again, just as Smith said. Under Rule 404(b) such evidence would be inadmissible; it was the classic use of other crimes to prove the character of the defendant and that he acted "in conformity therewith."

25. *Cf. United States v. Dray*, 901 F.2d 1132 (1st Cir.1990). In *Dray* the Court concluded that the evidence at issue had resolved different issues in the first trial, which resulted in an acquittal, than it did in the second.

26. Prior to *Dowling*, courts, including the Massachusetts Appeals Court in this case, applied a per se rule of exclusion on either constitutional grounds or on the grounds that the prejudicial effect of prior acquitted conduct deriving from the same transaction can never be outweighed by its probative value. For a review of all of these approaches, *see* Crawford, *Dowling v. United States: A Failure of the Criminal Justice System,* 52 Ohio St.L.J. 991, 996 (1991).

27. There is no question that a second prosecution, stemming from the same alleged offense for which the defendant was earlier acquitted has troubled the Supreme Court in other settings. In *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the Court expanded the traditional *Blockburger* test which focused only

Even if the Commonwealth had a more nuanced purpose for introducing the evidence of Rossetti's participation in the robbery—namely one of the permissible purposes under the Rule (motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident)—it is inconceivable that a jury could make such distinctions. Evidence of an offense so similar to the crime at issue (the substantive offense of robbery, conspiracy to commit the same robbery) so close in time (the day after the conspiracy) is fundamentally prejudicial. If the jury believed that Rossetti committed one crime on one day, it is likely to believe that he committed another the day before—precisely the kind of inference that Rule 404(b), Fed.R.Evid. prohibits. Moreover, there were no limiting instructions—not at the time of the testimony, not later. If there ever was the likelihood that such evidence would create the "constitutionally unacceptable risk that the jury will convict ... on the basis of inferences drawn from the acquitted conduct," it is in this case. *Cf. Dowling, supra* at 353.

Finally, the fact that Rossetti had to replay the same facts for which he had been acquitted only a short time before should give us pause, in that it implicates the concerns that motivate the Double Jeopardy Clause. Even if those concerns alone do not trigger the exclusion of the evidence,[26] they surely must be factors that weigh heavily in the balance a district court must make.[27]

on the technical elements of the offense in evaluating Double Jeopardy. Looking now to the offense that the Government actually proved, the Court held that a subsequent prosecution was barred "if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defense has already been prosecuted." *Id.* at 509, 110 S.Ct. at 2087. Successive prosecutions, Justice Brennan wrote, raise concerns beyond punishment, including questions of finality, harassment, and the risk of erroneous convictions. *Id.* at 517–19, 110 S.Ct. at 2091–92. The strict *Blockburger* test, even coupled with the *Ashe* collateral estoppel analysis, the Court found, was inadequate to address these concerns.

Three years later, a divided court in *United States v. Dixon,* —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) reversed. *Dixon* reaffirmed the *Blockburger/Ashe* line, and rejected the new more flexible Double Jeopardy test of *Grady*. Justice Souter, in dissent, noted:

Accordingly, I find that evidence of Rossetti's participation in the robbery, which had been resolved in his favor in the earlier case, should have been excluded from the conspiracy trial on the grounds that the introduction of such evidence violated the express terms of Rule 404(b), was unduly prejudicial and fundamentally unfair.[28]

### D. Harmless Error

■ Although the Massachusetts Appeals Court agreed that the presentation of evidence of Rossetti's role in the robbery was error, it found that error harmless because there was "overwhelming evidence of Rossetti's complicity in the conspiracy."[29] *Commonwealth v. Royce*, 20 Mass.App.Ct. 221, 228, 479 N.E.2d 198 (1985). The court applied the test of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), that the introduction of the evidence will be found to be harmless error if the court finds "beyond a reasonable doubt ... the evidence had no possible effect" on the verdict. *See also United States v. Gonzalez–Sanchez*, 825 F.2d 572, 584 (1st Cir.1987), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *Albert v. Montgomery*, 732 F.2d 865, 870 (11th Cir.1984). It then concluded that, apart from the improper evidence, the *Chapman* standard was met. I disagree.

■ The harmless error test depends upon how the error is characterized. If the error is of a constitutional nature, the *Chapman* test is appropriate. If the error is characterized as a simple evidentiary error, the test is whether the error "... had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (citing *Kotteakos v. U.S.*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).[30]

If a separate prosecution were permitted for every offense arising out of the same conduct, the government could manipulate the definitions of offenses, creating fine distinctions among them and permitting a zealous prosecutor to try a person again and again for essentially the same criminal conduct. While punishing different combinations of elements is consistent with the Double Jeopardy clause in its limitation on the imposition of multiple punishments (a limitation rooted in concerns with legislative intent), permitting such repeated prosecutions would not be consistent with the principles underlying the Clause in its limitation on successive prosecution.
—— U.S. at ——, 113 S.Ct. at 2883.
Speaking on the inadequacy of *Blockburger*, Justice Souter noted:
[S]ince the purpose of the Double Jeopardy Clauses's protection against successive prosecutions is to prevent repeated trials in which a defendant will be forced to defend against the same charge again and again, and in which the government may perfect its presentation with dress rehearsal after dress rehearsal, it should be irrelevant that the second prosecution would require the defendant to defend himself not only from the charge that he committed the robbery, but also from the charge of some additional fact, in this case, that the scene of the crime was a dwelling.
—— U.S. at ——, 113 S.Ct. at 2884.

**28.** It should be noted that the case law does not resolve the question of the scope of the exclusion of evidence. In other words, having found that the issue litigated in *Rossetti I* was the question of Rossetti's participation in the robbery, is the trial court obliged to exclude Smith's testimony on that subject only, or the physical evidence pertaining to it, as well? To be sure, while the physical evidence could have been used to buttress either claim, it was more closely related to the issue of Rossetti's substantive participation, i.e. the claim that some of the money stolen was found in his apartment, etc. I do not have to address that issue for the purpose of this habeas corpus petition since I conclude that the failure to exclude Smith's testimony on participation alone was not harmless error.

**29.** While it is true that "state court findings of fact are presumptively correct in habeas review," *Lacy v. Gardino*, 791 F.2d 980, 986 (1st Cir. 1986), *cert. denied*, 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986), this presumption does not also apply to conclusions of law. As the Appeals Court's finding of harmlessness is of the latter variety, I will determine the issue *de novo*.

**30.** There is a third possibility. A recent Supreme Court decision suggested that the test for nonconstitutional errors involving state prisoners is still more permissive, that state prisoners "are not entitled to habeas relief based on trial error unless they can establish it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).
The Supreme Court's most recent decision in *McAninch* suggested that *Brecht* did not announce a new rule. In fact, *McAninch* noted that *Brecht* cited to the same *Kotteakos* standard described above. —— U.S. at ——, 115 S.Ct. at 996.

Even by the most forgiving standard, the error in this case was not harmless. A review of the record reveals that, at each stage of the trial, from opening statement to the presentation of evidence to the closing argument, the Commonwealth emphasized and reemphasized the testimony and argument that Rossetti committed the robbery as proof of his participation in the conspiracy.

The jury first heard the argument that the conspiracy would be proved by testimony of the execution of the robbery in the prosecutor's opening argument. Discussing the evidence the Commonwealth would put before the jury, the prosecutor stated:

> And the evidence will indicate, ladies and gentlemen, that Louis Royce ... Kevin Whitford ... Stephen Rossetti ... and one Joseph Smith, who you will see as a witness during the trial ... conspired to commit armed robbery of a Brink's truck ... Now ladies and gentlemen, the evidence will indicate that they conspired to do that by means of weapons, firearms. And it will indicate ... that they did in fact commit that offense. You will hear evidence with respect to the robbery itself.

The prosecutor went on to describe the testimony of Joseph Smith, stating: "He'll tell you that ... these men were involved in that particular robbery."

Moreover, on Day Three of the trial, Joseph Smith testified about the robbery itself, detailing the individual movements of the defendants, including Petitioner. He testified:

> Mr. Sousa went to the front of the truck and met the guard right in front of the truck. Stephen Rossetti followed him, and they were both in front of the truck. Kevin Whitford disarmed the guard, took his gun. Stephen Rossetti put his gun away and grabbed the money bag. Joey Sousa

had that blue steel shotgun, the sawed-off shotgun, and Stephen had a pistol, the nine-millimeter. The bag fell on the ground. Stephen bent over and picked it up. After he grabbed the bag, Stephen went for the back of the car here.

Similarly, in the Prosecutor's closing argument, he again argued that the commission of the robbery proved the defendants' participation in the conspiracy. He stated:

> [The Brinks drivers' testimony] should leave no doubt in your mind that on December 4th of 1980 that robbery occurred. Think for yourself the details of the robbery ... the timing that was necessary. It is not unreasonable for you to infer that robbery was not a spontaneous crime. It didn't just happen. There were three people in that parking lot that day and the robbery went down like clock work without any further planning. Think to yourselves must there not have been a number of meetings in which that robbery was discussed.

Addressing the issue of Smith's credibility, the prosecutor relied on the "fact" of Petitioner's involvement in the robbery, stating, "Joseph Smith has never varied from telling anyone that he committed this robbery ... with Stephen Rossetti, Joseph Sousa and Louis Royce and Kevin Whitford." *See Albert v. Montgomery,* 732 F.2d 865 (11th Cir. 1984); [31] *United States v. Gonzalez–Sanchez,* 825 F.2d 572 (1st Cir.1987).[32]

Nor can I find that the remaining evidence of Rossetti's guilt, apart from the testimony of his participation in the robbery, is so overwhelming. The evidence divides into two categories, evidence that depended upon the credibility of Joseph Smith, and evidence that did not. After reading, and re-reading Smith's testimony, it is difficult to avoid the conclusion that rather than being "over-

---

**31.** In *Albert,* despite convincing evidence of guilt, the introduction of defendant's prior crime, for which he had been acquitted, was found harmful due to its prejudicial nature and prosecutor's heavy reliance on it in closing argument. The Court stated that "it is difficult for us to imagine anything more devastating in a case such as this than the fact that a defendant had committed the alleged act before." *Albert,* 732 F.2d at 871.

**32.** In *Gonzalez–Sanchez,* the Court found the introduction of evidence relating to a conspiracy for which the defendant had been acquitted was harmful. Emphasizing the incriminating nature of the evidence, the Court stated that "evidence of past crimes, committed with the same participants, is strongly probative of defendant's guilt of conspiracy to commit a similar crime." *Gonzalez–Sanchez,* 825 F.2d at 584.

whelming," Smith's testimony was exceedingly vulnerable. An earlier jury had completely rejected it.

With respect to the physical evidence independently linked to Rossetti—the money in his apartment, the guard's gun in the locker—the links were likewise not "overwhelming." The cash in Rossetti's apartment was not definitively traced to the serial numbers of cash delivered to the Brinks' guard. The only testimony on this subject concerned the serial numbers of the $800,000 in cash that had been sent out by the Federal Reserve early on the morning of December 4, which money was sent to a number of branches of the First National Bank of Boston, including the First National Bank in Jamaica Plain. (The Jamaica Plain branch received $153,-500.) Some of the serial numbers of the currency found in Rossetti's apartment (totalling $8,750) matched; more than half did not. Apart from the key to the storage locker found in Rossetti's apartment, and Smith's testimony, there was no other evidence associating Rossetti with that locker, and no evidence that others did not also have access to it. Moreover, Rossetti's witnesses offered an explanation for the physical evidence found, assuming such evidence was admissible at all (see note 28, supra).

█ Finally, it has been suggested to this Court that the trial court's instructions to the jury regarding conspiracy cured any prejudicial effect the foreclosed evidence may have had.[33] I disagree. I find that instructing the jurors on the law of conspiracy did not remedy the prejudice that emanated from the Commonwealth's refrain throughout the entire trial, that Rossetti's participation in the conspiracy could be inferred from his participation in the robbery.

In other settings, we recognize how acutely prejudicial the introduction of "other crimes" evidence is, and especially other similar crimes. We are reluctant to introduce evidence of similar convictions, even if they are offered for limited impeachment purposes under Rule 609, Fed.R.Evid.[34] We recognize the risk that the jury might seek to punish the defendant not for the offense on trial but for the earlier offense for which they believe he may have escaped punishment. See United States v. Beechum, 582 F.2d 898, 914 (5th Cir.1978). And in such situations we are appropriately skeptical of limiting instructions.

Introduction of evidence of Rossetti's participation in the robbery at the conspiracy trial, without a limiting instruction, plainly prejudiced Rossetti and skewed the outcome.[35]

33. The trial judge instructed that "whether or not these defendants were present at the bank on December 4, 1980 and whether or not they in fact attempted to hold up the bank is not an essential element of the crime alleged against them ..." and that "no overt act in furtherance of the conspiracy need be shown."

34. One commentator summarized the issues as follows: "Attribution theory ... is quite relevant in the setting of a criminal trial when a defendant is impeached with prior convictions or bad acts. Indeed, the 'halo effect' of prior convictions and bad acts would seem to be at its zenith in such a setting—i.e., a group of people, who do not know the defendant but must decide whether he or she has engaged in criminal activity, will infer negative characteristics about the defendant when they receive the noteworthy and negative information that he or she has previously engaged in criminal activity. According to attribution theory, the jury that hears about a defendant's prior convictions or bad acts will not consider that evidence solely in terms of the defendant's credibility, but also will form unfavorable impressions about the defendant's overall personality and believe that he or she is more likely to have committed the alleged crime, regardless of the evidence or lack of evidence presented." Okun, Character and Credibility: A Proposal to Realign Federal Rules of Evidence 608 and 609, 37 Vill.L.Rev. 533, 551 (1992). See Foster, Rule 609(a) in the Civil Context: A Recommendation for Reform, 57 Fordham L.Rev. 1, 33 (1988); Sonenshein, Circuit Roulette: The Use of Prior Convictions to Impeach Credibility in Civil Cases Under the Federal Rules of Evidence, 57 Geo.Wash.L.Rev. 279, 296 (Dec.1988). See also, Doob & Kirshenbaum, Some Empirical Evidence on the Effect of Section 12 of the Canada Evidence Act Upon An Accused, 15 Crim.L.Q. 88, 93–96 (1973); Hans & Doob, Section 12 of the Canada Evidence Act and the Deliberations of Simulated Juries, 18 Crim.L.Q. 235 (1975); Wissler & Saks, On the Inefficacy of Limiting Instructions: When Jurors Use Prior Conviction Evidence to Decide on Guilt, 9 Law & Hum.Behav. 37 (1986).

35. This is especially the case if collateral estoppel obliged the trial judge to exclude both the evidence of Smith's testimony as well as the physical evidence supporting Rossetti's participation in the robbery.

This petition for habeas corpus relief is hereby **GRANTED.**

**SO ORDERED.**