Volterra, J.
In June, 1993, the defendants, David Turner (“Turner”) and Stanley Travers, Jr. (“Travers”), were indicted by a Suffolk County Grand Juiy. Turner was charged with armed robbery while masked (Indictment Number 93-10603-001), with stealing by confining and putting in fear (Indictment Number 93-10603-002), with assault and battery by means of a dangerous weapon (Indictment Number 93-10603-005), with conspiracy to commit armed robbery (Indictment Number 93-10603-003), and with conspiracy to steal by confining and putting in fear (Indictment Number 93-10603-004). Travers was charged with being an accessory before the fact to armed robbery while being masked (Indictment Number 93-10604-001), with being an accessory before the fact in confining a person for the purpose of committing a felony (Indictment Number 93-10604-002), with conspiracy to commit armed robbery (Indictment Number 93-10604-003), and with conspiracy to steal by confining or putting in fear (Indictment Number 93-10604-004).
On June 2, 1995, the defendants were both acquitted by a jury of all the substantive offenses. The defendants now move to dismiss the conspiracy indictments on the grounds that they are barred by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the Massachusetts Declaration of Rights. For the following reasons, the defendants’ Motions to Dismiss the Indictments are ALLOWED.
BACKGROUND[2]
On September 2, 1991, between 1:00 a.m. and 4:00 a.m., the Hampshire House Restaurant (“Hampshire House”), commonly known as Cheers, located at 84 Beacon Street, Boston, Massachusetts, was robbed by two men. The two men entered the building through a back door, handcuffed two employees, Altir DeSouza (“DeSouza”) and Tracey Kozelek (“Kozelek”), and removed the contents of two safes which totaled approximately $18,000.00.
The Commonwealth charged Turner with armed robbery while being masked, with stealing by confining and putting in fear, with assault and battery by *32 means of a dangerous weapon, with conspiracy to commit armed robbery, and with conspiracy to steal by confining and putting in fear. The Commonwealth charged Travers with conspiracy to commit armed robbery, with conspiracy to steal by confining or putting in fear, with being an accessory before the fact to armed robbery while being masked, and with being an accessory before the fact in confining a person for the purpose of committing a felony. At the time of the robbery, Travers was an assistant manager and a bartender at the Hampshire House.
Beginning on May 23, 1995, both Turner and Travers were tried before a jury in Suffolk Superior Court for the substantive offenses arising out of the incident at the Hampshire House on September 2, 1991. The Commonwealth presented William Honeycutt (“Honeycutt”), the vice president and general manager of the Hampshire House as a witness. According to Honeycutt, on September 2, 1991, both Travers and Michael Murphy (“Murphy”) were employed at the Hampshire House. Murphy obtained his position through the recommendation of Travers. Honeycutt also testified that part of Travers’s duties was to reconcile the money at the end of his shift, to count the cash and to deposit the money in the safes at the restaurant. Honeycutt testified as to the conditions of the safes the morning after the robbery. He also stated that the time cards for Travers and Murphy showed that they both had worked the night of the robbery, September 2, 1991, and that Travers, as a member of the managerial staff had the ability to schedule Murphy to work that night.
Murphy was the doorman at the Hampshire House at the time of the robbery and was also living with Travers during this period. Murphy made an agreement with the Attorney General’s Office that he would testify and in return he would not be charged with a crime. Murphy testified that approximately a month before September 2, 1991, Travers said to him that is would be a good idea to rob Cheers, Labor Day weekend because there would be a lot of money on the premises. Murphy and Travers also had a second conversation about how the robbery could be accomplished. Murphy stated that Travers told him that the back door would be open and “it would be easy to do.” Trial Transcript, day 4, p. 10.[3]
Murphy also testified as to another conversation with Travers, which took place a few days after the first conversation. This third conversation took place while Murphy and Travers were riding to work in Travers’s car. Murphy testified that Travers again “said that it would be a good idea, he said, if Cheers, if we can rob Cheers, it would be a long weekend. He said there would be a lot of money.” Trans., day 4, p. 11. Travers also asked Murphy to commit the robbery by himself.
Murphy testified as to a fourth conversation between him and Travers which took place a few days after the third one. This fourth conversation was also about “the Cheers thing” and that Travers told him he “was going to meet a guy at TRC[4] named David Turner.” Trans., day 4, p. 13. Murphy further testified that there was a conversation between him, Travers, and Turner and that Travers said that Turner would commit the robbery. This conversation took place in the TRC parking lot. Murphy then went back to the car, while Travers and Turner remained in the parking lot talking for approximately five minutes. Murphy had another conversation with Travers in the car after they left TRC. Murphy stated that they “talked about the Cheers robbery, saying that it would be a good idea once again for the long weekend, couldn’t wait to do it.” Trans., day 4, p. 18.
Murphy testified that on Saturday afternoon, August 31, 1991, he was working at Cheers, carding people at the door. During that afternoon, Turner came into Cheers and told Murphy that he was there to look around the restaurant. Murphy further testified that he worked on Sunday, September 1, 1991, and that it was Travers who placed him on the schedule to work on that day. Murphy attested that Travers “wanted me to work that night with him because that’s when the robbery was going to happen.” Trans., day 4, p. 22.
Murphy also testified as to the events following the robbery. On the Tuesday after the robbery, he and Travers went to TRC, where Travers said that they were there to pick up some money. At TRC Turner gave Travers a bag containing $18,000.00.
During cross-examination Murphy testified as to another conversation that he had with Travers. This conversation took place while they were at work and Travers told Murphy that there was a second safe in the T-shirt room. Murphy stated that he informed Travers that he was not interested in participating in a robbery.
The Commonwealth also called Gray Morrison (“Morrison”) as a witness. Morrison admitted on the witness stand that he participated in the planning and the execution of the robbery at the Hampshire House on September 2, 1991. Morrison also testified extensively as to Turner’s participation in the robbery as well. Morrison was testifying for the government in exchange that his help would be considered when his brother-in-law Charlie Pappas’s (“Pappas”) case came up for trial.
Morrison testified that a few weeks before September 2, 1991, Turner telephoned him and asked to meet with him. Turner asked Morrison if he would be interested in doing a “score” with him. Morrison responded affirmatively and Turner told him he would get back to him. Morrison further testified that about a week after this first conversation Turner telephoned him again and asked Morrison to meet with him. This meeting took place in Turner’s car, where Turner told Morrison that Turner “had met with two kids that were supposed to set up the score and that as of that point it was, you know, it was still being looked into. It still wasn’t a definite but it still was being looked into.” Trans., day 5, p. 53. At this time Turner also told Morrison “that the score was going to be the Cheers barroom. The amount of money we was expecting to *33 get out of the Cheers barroom, it was supposed to be around the forty to fifty thousand dollar range, maybe more. The types of safes that were in there and the kids told him that it would be best to be done on a holiday weekend because that’s when they hold a more lump sum of money, you know, over a three day weekend.” Trans., day 5, p. 55. Morrison also stated that Turner gave him a description of the safes which were located in the Hampshire House.
Morrison also testified that he had a discussion with Pappas about the robbery. Morrison and Pappas talked about how Turner had approached Morrison about robbing the Hampshire House with him.
Morrison’s and Turner’s next meeting took place about a week after the second one. Morrison attested that Turner “had told me that he had to meet up with one of the kids from the inside, you know, that was setting up the score.” Trans., day 5, p. 56. Also during this meeting Morrison and Turner went to meet Travers. Morrison stayed in the car, while Turner andTravers had a five to ten minute conversation. Morrison testified that after Turner returned to the car he told Morrison “that we was all set and that the kid asked, told him, suggested that he would get three people to do the score instead of two.” Trans., day 5, p. 59.
Morrison stated further that a few days after the meeting between Turner and Travers, on a Saturday, that he and Turner drove down to the Cheers barroom. They went down to the bar to check for alarms and to see where the safes were located. According to Morrison, Travers had given Turner a “mental map” of where things were located, so they “just wanted to get an outlook of what the place looked like.” Trans., day 5, p. 60. They walked around the bar, looked for alarms and also looked at the exits. After they left Cheers, Morrison and Turner went and bought handcuffs and tools.
Morrison testified that he met Turner the next day at Turner’s house. At Turner’s house they discussed the robbery, including what type of vehicle to use and what types of tools they would need to break into the safes. Morrison attested that Turner told him that Travers had provided Turner with a description of the locks on the safes at Cheers. They also cleaned the tools they were planning on using, so that they would be free of fingerprints and identifying tags. After leaving Turner’s house, they went to Ryder Rental Truck in Braintree and stole a van to use in the robbery.
After stealing the van, they returned to Turner’s house where Turner was awaiting for a call from Travers. Morrison testified that Turner said that Travers was going to beep Turner “[t]o confirm and just like any last minute details of the robbery.” Trans., day 5, p. 77. Turner never received a call from Travers so Morrison said they decided to proceed with the robbery as planned.
Morrison next testified as to what happened once he and Turner drove the stolen van to Cheers. They met up with Travers, who said to Turner, “I thought that there was going to be three of you.” Turner responded to Travers that “I couldn’t get another guy that I trust.” Trans., day 5, p. 85. Travers also told Morrison and Turner that he would try to put something in the third door to hold it open for them. Morrison then went on to testify in detail about the actual robbery of the Hampshire House. He described how he and Turner entered Cheers, handcuffed the employees and stole the money from the safes.
The defense called Jeanine Fowler (“Fowler”), who was a manager at the Hampshire House during the period when the robbery occurred, as a witness. She testified that on the night of the robbery, Travers was under her supervision and that he did not leave the bar the entire evening. William DeCain (“DeCain”), who worked as a bartender at the Hampshire House, was also called by the defense. He testified that he also worked the night of the robbery and did not see Travers leave the building at any time that evening. The defense also presented Peter Bienvenue (“Bienvenue”), who was also an employee of the Hampshire House, but did not work on September 2, 1991. Bienvenue testified that he arrived at the bar between 1:00 a.m. and 1:30 a.m. that night to ride home to Brockton with Travers. He said that he stayed with Travers the entire time that he was there and saw Travers leave the bar area only to go to the kitchen. Bienvenue left the bar when it closed with Travers.
The defendants were tried before a jury in Suffolk Superior Court for the substantive offenses. Turner was tried for armed robbery while masked, stealing by confining and putting in fear, and assault and battery by means of a dangerous weapon. Travers was tried for being an accessory before the fact to armed robbery and for being an accessory before the fact in confining a person for the purpose of committing a felony. They were both acquitted of these substantive offenses on June 2, 1993. Following the acquittals on the substantive offenses, the Commonwealth moved for trial on the indictments charging each defendant with conspiracy to commit armed robbery and conspiracy to steal by confining or putting in fear. Turner and Travers each moved to dismiss the remaining indictments against them.
DISCUSSION
The defendants have moved to dismiss the conspiracy indictments pending against them, claiming that they are barred because of the collateral estoppel protection of the Double Jeopardy Clause. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution prohibits the federal government “from subjecting a defendant to more than one prosecution for the same offense.” Commonwealth v. Woods, 414 Mass. 343, 346 (1993). The Due Process Clause of the Fourteenth Amendment extended this prohibition to the state governments. Id. at 346. This guarantee against double jeopardy, although it was not expressly included in the Massachusetts Declaration of Rights, has been recognized as part of Massachusetts common law and statutory law. Id. at 346.
*34 Collateral estoppel is when an “issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.” Commonwealth v. Lopez, 383 Mass. 497, 499 (1981), quoting Ashe v. Swenson, 397 U.S. 436, 443 (1970). “Where a previous judgment of acquittal was based upon a general verdict. . . the court is required to ‘examine the record of a prior proceedings, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.’” Ashe v. Swenson, supra at 444, quoting Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv. L. Rev. 1, 38-39 (1960).
The issue in the present case is whether the first trial of Turner and Travers determined if they had formed a conspiracy to rob the Hampshire House on September 2, 1991. Ajury acquitted the defendants of the substantive offenses arising out of the September 2, 1991 incident. The Court reviewed the transcript of the first trial, as well as the undisputed facts submitted by the defendants in their memoranda in support of their motions to dismiss the indictments, to determine whether the issue of the alleged conspiracy was before the jury as well. See Ashe v. Swenson, supra at 445 (“The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not”).
Collateral estoppel “is an established rule of criminal law.” Commonwealth v. Benson, 389 Mass. 473, 478 (1983). The doctrine of collateral estoppel “requires the concurrence of three circumstances: (1) a common factual issue; (2) a prior determination of that issue in litigation between the same parties; and (3) a showing that the determination was in favor of the parly seeking to raise the estoppel bar.” Commonwealth v. Lopez, supra at 499, citing Copening v. United States, 353 A.2d 305, 309 (D.C. App. 1976). The burden is on the defendants to show that these three circumstances exist. Id. at 499, citing United States v. King, 563 F.2d 559, 561 (2d Cir. 1977). For the doctrine of collateral estoppel to apply to the case at bar, the defendants must show that the issue of whether they formed a conspiracy was determined by the jury at their first trial.
Collateral estoppel is applicable in two ways. The first way in which it can work is “it may bar totally a subsequent prosecution if one of the issues necessarily decided at the first trial is an essential element of the alleged crime in the second trial.” Commonwealth v. Benson, supra at 478. The second way is even if there is a second trial, “the doctrine may bar the introduction of certain facts determined in the defendant’s favor at the first trial.” Id. at 478.
Conspiracy has been defined by the Massachusetts courts as being “a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose . . . [T]he unlawful agreement constitutes the gist of the offence, and therefore ... it is not necessary to charge the execution of the unlawful agreement.” Id. at 479, quoting Commonwealth v. Dyer, 243 Mass. 472, 483 (1922). Under Massachusetts law a defendant “may be prosecuted both for conspiracy to commit an illegal act and for the illegal act, and such prosecutions are not barred on prior jeopardy grounds.” Commonwealth v. Gallarelli, 372 Mass. 573, 577 (1977), citing Commonwealth v. French, 357 Mass. 356, 393 (1970), judgments vacated as to death penalty sub nom. Limone v. Massachusetts, 408 U.S. 936 (1972). Mass.R.Crim.P. 9(e) requires that an indictment for conspiracy be tried separately from the indictment for the substantive crime, unless the defendant moves for joinder of the charges. The defendants did not move for joinder of the indictments against them, thus the Commonwealth was required to bring separate trials for the substantive offenses and for the conspiracy offenses arising out of the robbery at the Hampshire House. Since separate trials are not per se violative of the Double Jeopardy Clause, the remaining issue is whether with these two defendants and under these particular circumstances, a second trial on the conspiracy indictments would be unconstitutional.
Commonwealth v. Benson, supra, is easily distinguishable from the case at bar. In Commonwealth v. Benson, supra, the two defendants were acquitted on indictments charging them with arson and with breaking and entering with the intent to commit arson. They were subsequently charged with conspiracy to commit arson. The Supreme Judicial Court held that a second trial was not violative of the doctrine of collateral estoppel. Id. at 480-81. The Supreme Judicial Court concluded that “(s)ince the jury may have reached its decision rationally on some issue of ultimate fact other than that the defendants were not in any way responsible for the fire, the defendants have not met their burden of proving that this fact was necessarily determined by virtue of the general verdict of acquittal.” Id. at 481.
In the case at bar, Turner and Travers were acquitted of the substantive offenses related to the Hampshire House robbery. Murphy and Morrison testified as to Turner’s and Travers’s involvement in the planning and the execution of the robbery. After careful review of the trial transcript, the Court determines that the jury had to have considered the defendants possible involvement in a conspiracy to rob the bar when they deliberated on the substantive charges at the first trial. In Commonwealth v. Benson, supra, the Commonwealth planned to prove the charges of conspiracy by circumstantial evidence. Id. at 480. In the present case, it appears that any evidence which the Commonwealth would use to prove a conspiracy, was already presented at the first trial. Murphy testified that Travers approached him with an idea to rob the Hampshire House. Murphy also testified as to further conversations with Travers about the robbery and going with Travers to meet Turner. Morrison *35 testified as to being approached by Turner to commit the robbery, the planning of the robbery, and the actual execution of the robbery. It does not seem likely that the Commonwealth would have other evidence to present to prove Turner and Travers guilty of a conspiracy beyond a reasonable doubt.
The United States District Court for the District of Massachusetts, recently decided a case, Rossetti v. Curran, 891 F.Supp. 36 (D.Mass. 1995), that had nearly identical facts to the case at bar. In Rossetti v. Curran, supra, the U.S. District Court determined that a second trial convicting Stephen Rossetti of conspiracy after a first trial had acquitted him of the substantive crimes arising out of the same incident, was a violation of the collateral estoppel protection of the Double Jeopardy Clause of the United States Constitution. Rossetti was indicted for conspiracy to assault and rob with a dangerous weapon an employee of Brink’s, armed robbery with a dangerous weapon while masked, and armed assault with intent to rob. In both trials Joseph Smith, an accomplish, testified as to Rossetti’s involvement in both the planning and the commission of the robbery. Id. at 39. Smith testified in detail about Rossetti’s participation in the robbery. Id. at 39.
Smith’s credibility was attacked by the defense. There was testimony that Smith participated in an armed robbery while he was on escape from the Deer Island House of Correction (“Deer Island”) and that in return for his testimony, the Commonwealth promised parole on his unfinished sentence at Deer Island, a Massachusetts driver’s license, no prosecution for his role in the robbery, no prosecution for his escape from Deer Island, $1,500 in cash, and a plane ticket to anywhere in the continental United States. Id. at 39-40. The defense also presented testimony that Smith had lied to the police officers investigating the case. Id. at 40.
Rossetti presented a defense of alibi. Rossetti’s girlfriend testified that he was with her the day of the robbery and also during the time of some of the pre-plan-ning meetings. Id. at 40. Rossetti’s mother also testified as to his whereabouts the day of the robbery. Id. at 40. The jury at the first trial acquitted Rossetti on all counts. Id. at 40. The second trial, on the indictment charging conspiracy to assault and rob with a dangerous weapon, took place a year and a half after the first trial. Id. at 40.
The U.S. District Court found that the transcripts for the two trials were incredibly similar. Id. at 39. At the second trial, Smith testified in less detail about the planning stages of the robbery than he did at the first trial. Id. at 40-41. The jury at the second trial found Rossetti guilty of conspiracy.
The U.S. District Court found that the first trial resolved the ultimate issue of Rossetti’s planning of the robbery, thus, barring prosecution for the conspiracy. Id. at 43. The Court also found that
even if Rossetti I did not resolve the issue of Rossetti’s participation in the conspiracy, it clearly resolved the question of his participation in the robbery itself. The introduction of that testimony in Rossetti II was so prejudicial, so intertwined with the testimony of Rossetti’s alleged planning of the robbery, that no rational jury could disentangle them.
Id. at 43. Although in the case at bar there was only one trial, it seems likely that a second trial on the conspiracy indictments would be incredibly similar to the first, thus, raising the same question presented in Rossetti v. Curran, supra. A trial on the conspiracy charges would involve the same witnesses and the same testimony as was presented in the trial on the substantive offenses.
In Rossetti v. Curran, supra at 44, the Court concluded “that there is no basis upon which the jury could have acquitted Rossetti, other than by concluding that Rossetti had not participated in the criminal conduct at all, neither the robbery nor the conspiracy to commit it.” This Court agrees with the U.S. District Court opinion as applied to the case at bar. As in Rossetti v. Curran, supra, the issues of Turner’s and Travers’s involvement in the actual robbery at the Hampshire House and in the conspiracy are so intertwined that a second trial would probably be a repetition of the first one.
In Rossetti’s first trial, the jury had the choice of believing Joseph Smith’s account of the robbery in its entirety, or not. Smith testified as to the planning of the robbery as well as to the execution of it. Id. at 39. In the case at bar, there was testimony as to Turner’s and Travers’s alleged involvement in the Hampshire House robbery. Murphy testified as to the planning of the robbery and Morrison testified as to the planning as well as to the actual robbery itself. Turner presented a defense that Morrison committed the robbery with Pappas, Morrison’s brother-in-law. Both defense attorneys argued in their closings to the jury that Murphy and Morrison had both lied. The evidence of Turner’s and Travers’s participation in the robbery is weighed against the credibility of the prosecution’s two chief witnesses, Murphy and Morrison. See Rossetti v. Curran, supra at 49 (“The evidence divides into two categories, evidence that depended upon the credibility of Joseph Smith, and evidence that did not”). The jury verdict of not guilty implies that the jury disbelieved the testimony of Murphy and Morrison.
In a trial for the conspiracy charges the prosecution would present evidence attesting to the ultimate issue, the formation of an agreement to rob the Hampshire House. See Commonwealth v. Benson, supra at 479, quoting Commonwealth v. Dyer, 243 Mass. 472, 483 (1922). The Commonwealth would most likely present Murphy as a witness and he would testify as to Travers approaching him with a plan to rob the bar. Murphy would also testify as to the meeting between him, Travers, and Turner. The Commonwealth would also probably call Morrison to testify as to the ultimate issue. Morrison would attest to the planning of the robbery with Turner and to a meeting between Turner *36 and Travers in furtherance of the robbery. Both Murphy’s and Morrison’s testimony at the first trial delved into the formation of a plan by Turner and Travers to rob the Hampshire House. After reviewing the trial transcript, it is hard to imagine that the Commonwealth has new and/or different evidence to present at a second trial on the conspiracy indictments. It appears that the testimony given by Murphy and Morrison is the same as testimony which would be presented at a trial for conspiracy to prove the formation of an agreement to rob the Hampshire House.
There was no evidence presented that remotely suggested that Turner and Travers “had only been involved in the robbery and eschewed participation in the planning.” Id. at 45. The prosecution’s case relied on a theory that Turner and Travers were involved in the robbery from the inception of the idea right through to the post-robbery activities. The trial resolved both the issues of planning and participation, which would be the ultimate issues in a second trial on the conspiracy indictments. See Id. at 46.
If there was to be a second trial, then the doctrine of collateral estoppel would be applicable in barring the facts determined in the defendants’ favor in the first trial. Commonwealth v. Benson, supra at 478. Since Turner and Travers were both acquitted of the substantive crimes of robbery in the first trial, evidence of their alleged involvement in the robbery itself could not be admitted at a second trial. As previously mentioned, the evidence pertaining to the planning of the robbery and to the execution of the robbery were so entangled that it does not appear that the prosecution could separate the evidence for a second trial. Because the evidence of Turner’s and Travers’s participation in the robbery had been resolved in the first trial, it should be excluded from a second trial. See Rossetti v. Curran, supra at 48. Also since it is plausible to assume that the jury verdict reflected the belief that neither Turner nor Travers were involved in the robbery, including the planning ofit, there does not seem to be enough evidence for the prosecution to present at a second trial for conspiracy.
It appears that the three circumstances necessary for the application of collateral estoppel exist in the present case and that the defendants have met their burden by proving their existence. See Commonwealth v. Lopez, supra at 499. First, there is a common factual issue; the issue of Turner’s and Travers’s participation in the September 2, 1991 robbery at the Hampshire House. Second, the issue of their participation was determined in the trial on the substantive offenses. And third, the j ury verdict of not guilty was obviously in the defendants’ favor. Since it is evident that collateral estoppel is applicable to the case at bar, then a second trial on the conspiracy indictments would be a violation of the Double Jeopardy Clause of tire Fifth and Fourteenth Amendments to the United States Constitution and the Massachusetts Declaration of Rights.
ORDER
For the foregoing reasons, the defendants’ Motions to Dismiss Indictments are ALLOWED.

The defendants each submitted a summary of the evidence from the June 2, 1995 trial in their Motions. The Commonwealth in its Memorandum in Opposition to Defendants’ Motions to Dismiss stated that for the purposes of these motions, that it agreed with the defendants’ summaries of the evidence presented at the trial. The Court has reviewed portions of the trial transcript and has also adopted portions of the transcript, based on the briefs submitted by the defendants and the Commonwealth, and since there are no facts in dispute.

Hereafter referred to as: Trans., day , p. .

TRC is TRC Auto Electric, a business in Dorchester, Massachusetts, which is owned by Travers’s father.

The defendants, David Turner and Stanley R. Travers, Jr., each filed separate Motions to Dismiss. The Motions each seek to dismiss identical indictments against each defendant and the defendants’ arguments are based on facts arising from a joint trial on June 2, 1993; therefore, since the issue is the same for each defendant, the Court will rule on both Motions at this time.